## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACIA HALL,** *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>**DISTRICT OF COLUMBIA BOARD OF ELECTIONS,**<br><br>    *Defendant*. | **No. 1:23-cv-01261-ABJ** |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

ARGUMENT .................................................................................................................... 2

   I.   Plaintiffs Have Standing ........................................................................................ 2

   II.   Plaintiffs State a Plausible Claim that the Act Violates their Right, as Citizens, to Self-

Government. ................................................................................................................ 8

   III.   Plaintiffs State Plausible Claims that the Act Violates Equal Protection. ...................... 11

   IV.   Plaintiffs State a Plausible Substantive Due Process Claim. .......................................... 16

     A.   Plaintiffs allege the violation of a carefully-defined fundamental right. ..................... 18

     B.   The right to citizen self-government is deeply rooted in the Nation's history and

"implicit in the concept of ordered liberty." ...................................................................... 19

CONCLUSION .................................................................................................................. 24

## INTRODUCTION

The right of United States citizens to govern and be governed by themselves dates to the founding era. *See, e.g., United States v. United Foods*, 533 U.S. 405, 425 (2001) (Breyer, J., dissenting) (discussing the "democratic self-government that the Constitution seeks to create and to protect."). Accordingly, "[c]itizenship is . . . a concept fundamental to structures and processes established elsewhere in the Constitution." *Toll v. Moreno*, 458 U.S. 1, 42 n.13 (1982). The Supreme Court has consistently recognized the centrality of citizenship to democracy:

> The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State. The Constitution itself refers to the distinction no less than 11 times, indicating that the status of citizenship was meant to have significance in the structure of our government. The assumption of that status, whether by birth or naturalization, denotes an association with the poli[t]y which, in a democratic republic, exercises the powers of governance.

*Ambach v. Norwick*, 441 U.S. 68, 75 (1979) (internal citation omitted). *See also Adams v. Clinton*, 90 F. Supp. 2d 35, 97 (D.D.C. 2000) ("The importance of voting by the people in a representative democracy, such as the Constitution established, is so obvious that it is difficult to articulate its provenance. Yet, there is no dispute that voting by the people and the existence of a representative democracy are inextricably linked. One simply cannot exist without the other.") (Oberdorfer, J., dissenting in part and concurring in part).

The D.C. Noncitizen Voting Act diminishes the electoral power of U.S. citizens, as a group, in the District of Columbia, and, by allowing noncitizens both to vote and to hold public office, allows for citizens to be governed by noncitizens. Perhaps unsurprisingly, given the fundamental importance of citizenship in our democracy, the Act is unconstitutional on more than one basis, as spelled out in the Complaint. The Act infringes plaintiffs' clear constitutional right to be governed by their citizen peers, denies them equal protection of the law, and violates their right to substantive

due process. These claims are more than plausible, and Defendant's arguments that they should be dismissed fall flat at every turn.

## ARGUMENT

### I.      Plaintiffs Have Standing.

Defendant first challenges standing. To establish Article III standing, plaintiffs must "plausibly allege three familiar requirements:" injury-in-fact, causation, and redressability. *Campaign Legal Ctr. v. FEC*, 860 F. App'x 1, 3 (D.C. Cir. 2021) (internal citations omitted). *See also Adams v. Clinton*, 90 F. Supp. 2d 35, 40-41 (D.D.C. 2000) ("Standing exists if a plaintiff sufficiently alleges an injury in fact that (i) can fairly be traced to the defendant's challenged action and (ii) is likely to be redressed by a favorable decision."). In conducting the standing analysis, "the court must assume that the [plaintiff] will prevail on the merits." *Campaign Legal Ctr*, 860 F. App'x at 3. (alteration original) (citation omitted). *See also Adams*, 90 F. Supp. at 41 ("For the purposes of standing analysis, we assume the validity of a plaintiff's substantive claim.") (citation omitted). To be cognizable, a plaintiff's claimed injury must be "(1) concrete, (2) particularized, and (3) actual or imminent. A concrete injury is direct, real, and palpable—not abstract. A particularized injury is personal, individual, distinct, and differentiated—not generalized or undifferentiated. An actual or imminent injury is certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (2015) (internal citations omitted).

Defendant claims that plaintiffs, in alleging vote dilution, have not alleged a concrete and particularized injury, because that injury is shared by all citizen-voters in D.C. Doc. 8 at 10. Defendant misunderstands the requirement that an injury be particularized, conflating a widely-shared injury with a general grievance about government that does not support standing:

> Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found "injury in fact." See *Public Citizen [v. United States Dep't of Justice]* 491 U.S. [440] at 449-450 [(1989)] ("The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure . . . does not lessen [their] asserted injury"). Thus the fact that a political forum may be more readily available where an injury is widely shared (while counseling against, say, interpreting a statute as conferring standing) does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an "injury in fact." This conclusion seems particularly obvious where (to use a hypothetical example) large numbers of individuals suffer the same common-law injury (say, a widespread mass tort), or where large numbers of voters suffer interference with voting rights conferred by law.

*FEC v. Akins*, 524 U.S. 11, 24 (1998).

Accordingly, vote dilution has long been recognized as a particularized injury for standing purposes. As Justice Kagan explained in *Gill v. Whitford*, "[t]he harm of vote dilution . . . is individual and personal in nature." *Gill v. Whitford*, 138 S. Ct. 1916, 1935 (Kagan, J., concurring). *See also Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) ("The Supreme Court has 'long recognized that a person's right to vote is individual and personal in nature' and 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' as they have alleged a concrete and particularized injury.") (quoting *Gill*, 138 S. Ct. at 1929) (opinion of the Court); *Lyman v. Baker*, 954 F.3d 351, 362 (1st Cir. 2020) (finding standing based on a claim of vote dilution and explaining that "[t]he voter, after all, is presumptively the best person to bring a challenge to an alleged infringement of her constitutionally protected voting rights."). *Cf. Gordon v. Haas*, 828 F. Supp. 2d 13, 19 (D.D.C. 2011) (rejecting standing because plaintiff failed to allege dilution of his own vote: "Gordon remains a voter only in the District of Columbia. The allegation that he suffers

injury from alleged minority vote dilution in the five states does not save his claim. For his claim to survive, Gordon must aver that *his* vote has been diluted. He does not and cannot make such an allegation in this action and therefore suffers no cognizable injury for purposes of constitutional standing".) (emphasis in original).

One kind—but far from the only kind—of vote dilution claim is partisan gerrymandering, which requires that a plaintiff live in a district that has been either "cracked" or "packed" to lessen the weight of his or her individual vote. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2492 (2019). While "such practices invariably affect more than one citizen at a time[,]" the Court "understood the injury as giving diminished weight to each particular vote, even if millions were so touched. In such cases, a voter living in an overpopulated district suffered disadvantage to [herself] as [an] individual[]: Her vote counted for less than the votes of other citizens in her State." *Gill*, 138 S. Ct. at 1935 (Kagan, J., concurring) (alteration in original) (internal citation and quotation marks omitted).

There are other kinds of vote dilution that give rise to standing. In census-related apportionment cases, "plaintiffs alleging vote dilution injuries must show that their states would have had an additional representative but for the government's error." *Citizens for Const. Integrity v. Census Bureau*, Civil Action No. 1:21-cv-03045, 2023 U.S. Dist. LEXIS 67820, at *7 (D.D.C. Apr. 18, 2023). *See also DOC v. United States House of Representatives*, 525 U.S. 316, 332-34 (1999) (finding appellees, registered voters in different counties and different states, had satisfied Article III injury requirements because they "ha[d] a strong claim that they will be injured by the Bureau's plan because their votes will be diluted vis-à-vis residents of counties with larger 'undercount' rates."). Racial gerrymandering, another type of vote dilution, gives rise to a cognizable injury because "[t]he resulting discrimination against those individual voters living in

disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State." *Reynolds v. Sims*, 377 U.S. 533, 563 (1964).

Plaintiffs here have standing because the vote dilution injury they allege is not a general complaint about government but one particular to them as individual voters in the District of Columbia. Plaintiffs "contend that their votes are diluted in [a] particular election . . . in [a] particular geographic area[,] . . . . [and] that they are an identifiable group of voters whose votes are disfavored vis-à-vis those of some other group." *Daughtrey v. Carter*, 584 F. 2d 1050, 1056 (D.C. Cir. 1978). *See also Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994) (holding that plaintiffs had standing to bring a vote-dilution claim even though their injury was shared by all voters in all states).

Furthermore, defendant's contention that plaintiffs must, and have not, shown an intent to vote or run for office is incorrect. The plaintiffs in *Yazzie v. Hobbs*, cited by defendant, Doc. 8 at 9, challenged generally applicable procedures for counting absentee ballots under the Voting Rights Act based only on their "general desire to participate in the electoral and political processes of Arizona on an equal basis with non-Indian voters." *Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020). In contrast, plaintiffs in this case have all registered to vote in D.C., showing not a "general desire," but a particular one, to participate in D.C. elections. Indeed, there is a strong "inference that registered voters (particularly those who bring voting rights lawsuits) will likely vote at some point[.]" *League of United Latin Am. Citizens v. Abbott*, 2021 U.S. Dist. LEXIS 247856, at *7 n.1 (W.D. Tex. Dec. 30, 2021). As for *Carney v. Adams*, Doc. 8 at 9, there the Supreme Court found that the plaintiff did not have standing to challenge qualifications for judicial elections because he did not make a showing that he was "likely to apply to become a judge in the reasonably

foreseeable future," and thus was not "able and ready to apply" for a judgeship. *Carney v. Adams*, 141 S. Ct. 493, 499-500 (2020). As the *Carney* Court explained, however, the Supreme Court has found standing in "arguably similar cases . . . [that] contained more evidence that the plaintiff was able and ready" based on such plaintiff's past practices. *Id*. at 502. Plaintiffs here have previously run for office as recently as the last election, a past practice that shows that they are in fact "able and ready" to do so in the future.

The cases challenging the results of the 2020 election defendant relies on are also distinguishable because those cases involved allegations of voter fraud, and therefore with some plausibility could be held to involve only a generalized interest in the proper operation of government. Even if rightly decided, they did not involve a duly-enacted law, as this case does, that is certain to cause vote dilution—a particularized injury—to each plaintiff, much less a policy that facially dilutes the votes of two protected classes: U.S. citizens and those of American national origin. If plaintiffs are right on the merits, their constitutional rights have been violated, and this harm is particularized to each plaintiff, for each plaintiff's vote has been diluted.

For example, in *Wood v. Raffensperger*, the Eleventh Circuit explained that "[a]ll Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in ensuring that [a presidential election] is properly administered." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (alteration original) (internal quotation marks omitted). The Court went on to explain that while "various nonparties might have a particularized injury," Wood "is at most a 'concerned bystander.'" *Id*. at 1316 (quoting *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004)). The Court did not, however, rule out all vote dilution injuries, explaining that "vote dilution can be a basis for standing" where is has "a point of comparison." *Id*. Here, the point of comparison is a point in time: the time before the enactment

of the D.C. Noncitizen Voting Act, with the comparison being between the strength of citizens' votes at that time and their diminished strength after enactment.

Defendant's reliance on the Third Circuit's holding in *Bognet v. Sec'y of Pa.*, another voter fraud case, also fails. There, the court determined that "the purported vote dilution is . . . not concrete because it would occur in equal proportion *without* the alleged procedural illegality—that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively." *Bognet v. Sec'y Pa*, 980 F.3d 336, 353 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (emphasis in original). Whatever the merits of this argument, it does not apply to this case; plaintiffs' votes would have remained undiluted but for the existence of the D.C. Noncitizen Voting Act, which plaintiffs, of course, do challenge substantively.

In short, plaintiffs have standing because they allege an injury—dilution of their votes—that has again and again been recognized as particularized, and do not merely assert a general interest in the proper operation of government. Also, if plaintiffs are right on the merits, their constitutional rights to be governed by their citizen peers, to equal protection, and to substantive due process are infringed by the Act. Defendant does not even attempt to show that the violation of these rights is not a particularized injury, and would be unable to do so. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 291 n.8 (1987) ("It would violate the Equal Protection Clause for a State to base enforcement of its criminal laws on an unjustifiable standard such as race, religion, or other arbitrary classification. Because McClesky raises such a claim, he has standing."); *AFGE v. OPM (In re United States OPM Data Sec. Breach Litig.)*, 928 F.3d 42, 55 (D.C. Cir. 2019) ("Plaintiffs have standing based on their claimed constitutional injury."); *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 637 (5th Cir. 2012) ("Because the legislation targets the plaintiffs for exclusion from

this benefit provided to similarly situated speakers, TCA and Time Warner have shown constitutional injury sufficient to establish standing.").

## II.     Plaintiffs State a Plausible Claim that the Act Violates their Right, as Citizens, to Self-Government.

Defendant attempts to disparage the right to citizen self-government, and of citizens to be governed by their citizen peers, as speculative and not deeply-rooted in history, despite numerous Supreme Court holdings setting forth these rights. Doc. 8 at 12-16. In fact, nothing could be clearer than the Constitution's proclamation of popular sovereignty over an independent nation, and from that sovereignty of the people there is at most a small step—explicitly taken by the Court—to the sovereignty of U.S. citizens.

In the first sentence of the Constitution, "We the People of the United States" "ordain and establish" the Constitution. U.S. Const., Preamble. Later, that Constitution is proclaimed to be "the supreme Law of the Land." U.S. Const. Art, VI, cl. 2. In the Constitution, then, the people ordained and established the supreme law of the land. Only the sovereign of an independent United States would have had the power to do so. Thus, the Constitution proclaims in plain sight, with no need of a more explicit statement, the sovereignty of the people over this nation. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 454 (1793) ("To the Constitution of the United States the term SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who ordained and established that Constitution. They might have announced themselves 'SOVEREIGN' people of the United States: But serenely conscious of the fact, they avoided the ostentatious declaration.") (alterations original) (superseded, on other grounds, by statute); *Adams*, 90 F. Supp. at 97 ("[T]he very structure of the national government [is] subjected by the Constitution to the ultimate sovereignty of the people.") (Oberdorfer, J., concurring in part and dissenting in part).

8

The Supreme Court merely assumed the obvious when it equated the people with United States citizens. And it explicated the rights that flow from citizen sovereignty. "The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a *necessary consequence* of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439-440 (1982) (emphasis added). American citizens, including foreign-born American citizens, comprise the body politic of the United States. *See id.* ("Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community."); *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) ("The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized a State's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's *obligation* to preserve the basic conception of a political community.") (internal citation omitted) (emphasis added); *id.* at 296 ("[A] democratic society is *ruled by its people. Thus*, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions.") (emphasis added); *id.* (holding that such restrictions "represent[] the choice, and *right, of the people to be governed by their citizen peers.*") (emphasis added); *id.* at 297 ("[A]lthough we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.").

Of course, this restriction of the body politic to citizens, and their right to self-government, has the "practical consequence" that restricting municipal jobs that involve governing functions,

and the vote in municipal elections, to citizens does not offend the Equal Protection Clause. *Id.* at 296. But the premise that the Court articulated for this conclusion, and is a necessary part of its reasoning, states and implies much more. It is an affirmation of the right of United States citizens to govern, and be governed by, themselves. The Court based its holdings on self-evident principles about how democratic nations are governed, and did not mention any specific constitutional provisions. Thus, by pointing in the Complaint to a Supreme Court decision recognizing the right plaintiffs assert, and quoting that decision's description of that right, plaintiffs satisfy every requirement of pleading despite defendant's jibe that they, also, do not mention any specific constitutional provisions. Doc. 8 at 5. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring sufficient facts "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Twombly*, 550 U.S. at 556)); *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (1987) ("[I]f plaintiff is asserting a claim for constitutional violations he should do so with the requisite specificity, so as to give defendants notice, plead the involvement of each defendant and clarify what constitutional right has been violated.").

In any event, as shown above, nothing is more obvious than the foundational nature of popular sovereignty in the Constitution, in which "the People" established the supreme law of the land. All the Court did in these cases is make the obvious—the only possible—equation of the people with U.S. citizens, and draw out certain consequences of popular sovereignty, notably "the right[] of the people to be governed by their citizen peers." *Foley*, 435 U.S. at 297.

Plaintiffs have stated a plausible claim that the D.C. Noncitizen Voting Act, by giving the vote to noncitizens and allowing them to hold public offices, including Council Member and

Mayor, by its very essence directly infringes their right, repeatedly recognized by the Supreme Court, to be governed by their fellow citizens.

**III.     Plaintiffs State Plausible Claims that the Act Violates Equal Protection.**

The D.C. Noncitizen Voting Act gives noncitizens living in D.C. what they never had—the right to vote. And it takes away from D.C. citizens what they have always had—the exclusive right to vote. Put another way, the Act's grant of the *benefit* of voting to noncitizens *burdens* citizens by diluting their votes. This starkly differing treatment of two groups classified by the Act meets the threshold requirement for an equal protection challenge. "Analysis of an equal protection claim alleging an improper statutory classification involves two steps. Appellants must first show that the statute, either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group." *United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995) (citing *Jones v. Helms,* 452 U.S. 412, 423-24 (1981) and *Hernandez v. Texas,* 347 U.S. 475, 479 (1954)). Thus, claims of vote dilution have consistently been analyzed under the Equal Protection Clause. *See Reynolds v. Sims*, 377 U.S. 533 (1964) (one-person, one-vote); (citing  *Brown v. Bd. of Comm'rs.* 722 F. Supp. 380 (E.D. Tenn. 1989) (non-resident voting); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (partisan gerrymandering). Of course, the Act also treats citizens and noncitizens "the same" by letting both groups vote. But it is hardly impossible for the same government policy to treat two groups equally and also unequally. Allowing nonresident property owners to vote in a city puts them on a par with city residents, but at the same time benefits the former and harms the latter. *See Brown v. Bd. of Comm'rs*, 722 F. Supp. 380, 398 (E.D. Tenn. 1989) (striking down an expansion of the franchise to nonresidents of a city under the Equal Protection Clause). Closing the voter registration office in a Louisiana parish to both whites and blacks treated white and black

applicants to vote the same, but also differently where the majority of voting-age whites in the parish were already registered and the majority of voting-age blacks were not. *United States v. Palmer*, 356 F.2d 951, 952 (5th Cir. 1966).

Second, the Act, on its face, expands the number of foreign-born persons who may vote, thus benefitting this group (which includes both citizens and noncitizens) and, consequently, harming the native-born by diluting their votes. In a word, the Act shrinks the political influence of native-born Americans in Washington, D.C. It does so on its face, since, of course, all of the noncitizens allowed to vote by the Act are foreign-born.

These groups, both of which all plaintiffs are members of, are harmed, on the face of the Act, based on protected characteristics. Citizenship is a suspect classification, with the single exception, not operative here, of when *aliens* are barred from voting or governing. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 105 (1973) ("The highly suspect character of classifications based on race, nationality, or alienage is well established.") (Brennan, J., dissenting); *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) ("Alienage classifications by a State that do not withstand this stringent examination cannot stand."); *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 372 (S.D.N.Y. 2014) ("[T]he Court has repeatedly applied strict scrutiny to statutes discriminating on the basis of alienage."). Because aliens—that is, persons without United States citizenship—form a protected class, United States citizens should also form a protected class. Otherwise, a paradox would be created: the United States citizens who established our Constitution would have given lesser protection to themselves, as a group, than to those of foreign citizenship.

Of course, laws burdening citizens as a class are rare. There is no history, for example, of citizens being barred from owning laundries, or from serving as police officers. But the Equal Protection Clause applies to "persons," not citizens, and thus protects citizens from laws, such as the D.C. Noncitizen Voting Act or a hypothetical law barring all citizens from owning laundries, that treat all citizens equally. In other words, the Equal Protection Clause protects citizens from being disadvantaged as a group, as compared with noncitizens. And it would be paradoxical to hold that citizens receive *less* protection as a group, when so disadvantaged, than noncitizens do.

But even if American citizens do not receive at least the same level of protection under the Equal Protection Clause as non-American citizens do, and thus, in the rare event that a law burdens citizens on its face, that law does not receive the strict scrutiny that laws burdening noncitizens receive, the D.C. Noncitizen Voter Act also, on its face, dilutes the votes of American-born District of Columbia voters. It does so because its addition of noncitizens to the voter rolls automatically adds only persons of non-American birth. National-origin classifications also are suspect. And persons of American birth or ancestry, like those of birth or ancestry in any other country, are a national origin group, and thus a protected class even if American citizens somehow are not. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) ("The term 'national origin' on its face refers to the country where a person was born, or more broadly, the country from which his or her ancestors came."); *Hernandez v. Texas*, 347 U.S. 475, 479 (1954) ("The exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment."); *Tippie v. Spacelabs Medical, Inc.*, 180 Fed. App'x 51, 55 (11th Cir. 2006) (finding a prima facie case of national origin discrimination where American citizen plaintiff was denied employment in favor of a non-American citizen); *Chaiffetz v. Robertson Research Holding Ltd.*, 798 F.2d 731, 733 (5th Cir. 1986) ("We agree that

13

employment discrimination based only on one's country of birth, whether that birthplace is the United States or elsewhere, contradicts the purpose and intent of Title VII."); *Malina v. Makitso United States LLC*, No. 4:19-01808, 2019 U.S. Dist. LEXIS 213113, at *7-8 (S.D. Tex. Oct. 18, 2019) (permitting plaintiff to "assert Title VII discrimination and harassment claims based on her 'American' national origin."); *Thomas v. Rohner-Gehrig & Co.*, 582 F. Supp. 669, 675 (N.D. Ill. 1984) (holding that an employment discrimination claim based on American national origin was legally cognizable).

Against the claim that the Act treats persons in D.C. differently based on two protected grounds—citizenship and national origin—defendant responds only with the assertion that the Act is "facially neutral." The cases defendant cites, however, show the opposite. In *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016), cited by defendant in Doc. 8 at 17, the D.C. Circuit held that the placement of a streetcar project in a neighborhood that was largely black was "facially neutral" because the selection of that neighborhood on its face was geographical, not racial, many other parts of the District also being predominantly black. And in *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), Doc. 8 at 18, the same court held that chaplain-selection policies were neutral on their face because, on their face, they did not treat religious denominations differently. In both of these cases, laws were facially neutral simply because on their face they did not treat people differently on the bases—race and religion, respectively—that *plaintiffs claimed*. Here, of course, the Act burdens citizens in the way described above by its terms, which also, by logical operation, shrink the voting power of native-born Americans. The Act is thus *not* "facially neutral," but on its face treats people differently on the very bases plaintiffs claim.

Laws, such as the D.C. Noncitizen Voting Act, that on their face treat people differently based on a protected characteristic receive strict scrutiny and do not require an inquiry into legislative purpose. *See Shaw v. Reno*, 509 U.S. 630, 632, 643 (1993) ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute."). "Express racial classifications are immediately suspect because 'absent searching judicial inquiry . . . . there is simply no way of determining what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Id.* (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 8 (1989) (plurality opinion)); *Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (explaining that facial classifications based on race, alienage, and national origin "are so seldom relevant to the achievement of any legitimate state interest," that they "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.") (superseded by statute on other grounds) (internal citations omitted); *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (explaining that facial discrimination occurs "[w]hen the government expressly classifies persons on the basis of race or national origin."). On its face, the Act, by expanding the franchise to noncitizens, dilutes the votes of citizens, a protected class. Also on its face, it adds only foreign-born (because noncitizen) voters to the rolls, and thus dilutes the votes of non-foreign-born—that is, American-born—voters, also a protected class.

The Act cannot pass strict scrutiny. Defendant claims that "[t]he District has a compelling interest in democratic self-government, *i.e.*, defining its political community and ensuring that

members of that community have a voice in their government." Doc. 8 at 17. But this claimed interest does not even provide a rational basis for the law, or a cognizable interest necessary to pass the *Anderson-Burdick* test applicable to voting changes not based on protected characteristics.[1] D.C. has no cognizable interest, let alone a "compelling" one, in defining its political community in a way that contradicts the way the political community of the United States is defined, according to the Supreme Court, in the Constitution, and that diminishes the sovereignty of that political community. In America, "We the People" are sovereign. D.C. has no interest a United States court can recognize in legislating otherwise.

Citizens and the American-born, in the so-far rare event they are burdened based on these characteristics, deserve equal protection as much as any other protected groups. Plaintiffs have plausibly stated their claims that the D.C. Noncitizen Voting Act violates their right to equal protection under the Fifth Amendment.

## IV.   Plaintiffs State a Plausible Substantive Due Process Claim.

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997). Thus, substantive due process provides protection to citizens "in addition to the specific freedoms protected by the Bill of Rights." *Id.* at 720. *See also Sotto v. Wainwright*, 601 F.2d 184, 190 (5th Cir. 1979) ("The substantive component

---

[1] *See, e.g., Richardson v. Trump*, 496 F. Supp. 3d 165, 181 (D.D.C. 2020) ("Under the *Anderson-Burdick* line of cases, courts have recognized that [e]lection laws will invariably impose some burden upon individual voters, and that not all laws burdening the right to vote are subject to strict scrutiny. Instead, courts must first consider the character and magnitude of the asserted injury to the plaintiffs' right to vote against the precise interests put forward by the [government] as justifications for the burden imposed[,] including the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights.") (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)) (alterations in original) (internal quotation marks omitted).

of the due process clause which goes beyond the specific provisions of the Bill of Rights embodies a conception of fundamental justice.") (citation omitted).

As defendant points out, Doc. 8 at 12-13, the D.C. Circuit and the Supreme Court have held that where the Constitution contains an explicit protection, a party is unable also to allege a substantive due process claim. *See Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'") (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). But the cases cited by defendant in support of dismissing plaintiffs' substantive due process claim on this basis, Doc. 8 at 16-17, are inapposite because they dealt with search and seizure injuries that are explicitly protected by the Fourth Amendment. These cases in no way show, contrary to defendant's assertion, that the implicit protection of the equal protection component of the Due Process Clause supplants the implicit protection of substantive due process under the same clause, and precludes the latter claim.

As the Supreme Court set forth, there is a two-step process for analyzing substantive due process claims:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking, that direct and restrain our exposition of the Due Process Clause. As we stated recently . . . the Fourteenth Amendment forbids the government to infringe . . . fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks and internal citations omitted) (emphasis in original). *See also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022) (explaining that a court must ask "whether the right is deeply rooted in [our] history and tradition and whether it is essential to our Nation's scheme of ordered liberty."). The determination of whether a right is implicit in the concept of ordered liberty," *Abigail All. for Better Access to Developmental Drugs v. Von Eschenbach*, 495 F. 3d 695, 718 (D.C. Cir. 2007) (quotation marks and citation omitted), is an important part of this test. Among the rights recognized as "implicit in the concept of ordered liberty" are the right of association, *NAACP v. Alabama*, 357 U.S. 449 (1958); the right to access the courts, *NAACP v. Button*, 371 U.S. 416 (1963); and, as relevant here, the right to vote, *Harper v. Virginia State Board*, 383 U.S. 663 (1966).

### A.  Plaintiffs allege the violation of a carefully-defined fundamental right.

"Substantive due process analysis must begin with a careful description of the asserted right, for the 'doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores*, 507 U.S. 292, 302 (1993) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). *See also Abigail All. For Better Access to Developmental Drugs v. Von Eschenbach*, 495 F.3d 695, 701 n.5 (D.C. Cir. 2007) (explaining that the "threshold requirement" for substantive due process is "a carefully described right").

Defendant asserts that Plaintiffs have not carefully defined the right at issue in this case, then suggests one proper formulation: "a purported right to have one's vote counted without the presence of non-citizens' votes." Doc. 8 at 19. Plaintiffs' complaint, however, does allege the exact "carefully described" right defendant suggests—plaintiffs complain that the D.C. Noncitizen Voting Act dilutes their fundamental right to vote by including noncitizens in the eligible voter

and candidate pools. Pl. Compl., Doc.1-1 at 15. Another formulation of this right is the right to citizen self-government, which plaintiffs allege the Act violates. *Id.* at 16.

**B. The right to citizen self-government is deeply rooted in the Nation's history and "implicit in the concept of ordered liberty."**

To receive protection under substantive due process, the "carefully described" right must also be "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quotation marks and citation omitted).

As shown above, the right to citizen self-government is set forth, with the Declaration of Independence as a backdrop, in the text of the Constitution, both in the Preamble (only a sovereign "People"—that is, citizenry—of an independent nation could establish a constitution) and in the Preamble together with the Supremacy Clause (only a people or citizenry that was sovereign over an independent nation could establish "the supreme law of the land"). *See Brackeen v. Haaland*, 994 F.3d 249, 274 n.2 (5th Cir. 2021) ("The Constitution rooted its legitimacy in the consent of those whom it would come to govern, declaring that the system it outlined was 'ordained and established' by 'We the people,' U.S. Const. Preamble."), *rev'd on unrelated grounds by Haaland v. Brackeen*, 143 S. Ct. 1609 (2023); *United States Term Limits v. Thornton*, 514 U.S. 779, 849 (1995) (Thomas, J., dissenting) (discussing "the notion of popular sovereignty that undergirds the Constitution."); *Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells*, 204 N.J. 79, 149, 7 A.3d 720, 763 (N.J. S. Ct. 2010) (discussing the "fundamental notions of popular sovereignty, that is, that all power resides with the people and that it is only by their consent that the people may be governed. That doctrine finds its most familiar expression in the Declaration of Independence"); *id.* at 150 ("That the doctrine of popular sovereignty is infused in our deepest

historical traditions cannot be ignored."). But even if this textual basis is deemed insufficiently "explicit," the right is still fundamental.

It is fundamental, first of all, because it *is* clearly—even if implicitly—set forth in the Constitution, starting with that document's *first three words*. And the Supreme Court has repeatedly described the right as fundamental to the very idea of a self-governing democracy. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 404-05 (1819) ("The government of the Union . . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."); *Reynolds v. Sims*, 377 U.S. 533, 565 (1964) ("But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies."); *Alden v. Maine*, 527 U.S. 706 (1999) ("By splitting the atom of sovereignty, the founders established two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain and are governed by it."). It would take a great deal of contrary historical evidence, given the foundational importance of popular sovereignty and citizen self-government in both the Constitution and the basic theory of democracy, to show that this right is not "deeply-rooted" in our history. That defendant does not provide.

Defendant asserts that "a long history of non-citizen voting refutes" plaintiffs' claims. Doc. 8 at 12. But almost all of the history defendant cites occurred before there was any clear rule about *who was* a United States citizen, that is, before the Citizenship Clause of the Fourteenth Amendment. Doc. 8, at 13. For example, the cited portion of the Massachusetts Constitution was written by John Adams in 1780, seven years before the U.S. Constitution was ratified. Mass. Const.

pt. 2, ch. I, § 3, art. IV (1780). Three of the other cited constitutions were drafted in 1776. During this period there was no clear rule defining who was a citizen of the United States.

And while citizenship is of vital importance in the U.S. Constitution, there was no clear rule about who was a citizen even long after it was adopted. The Constitution explicitly authorized Congress "[t]o establish a uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, but it did not provide or require a definition of citizenship. The very first Congress exercised this power not to define who a citizen was but to provide procedures for aliens seeking to become citizens. Naturalization Act of 1790, ch. 3, 1 Stat. 103. Thus, a U.S. citizenship requirement in early state constitutions would have only created confusion about voter qualifications even after Congress began exercising its constitutional authority to make rules for immigration and naturalization. The lack of such a requirement in these documents seems merely a practical accommodation to this reality, and as such can hardly constitute "strong evidence" of "how the founding generation conceived the right" to citizen self-government. *District of Columbia v. Heller*, 554 U.S. 570, 603 (2008).

Indeed, the Massachusetts Constitution reflects the same theory of popular sovereignty, and the equation of the sovereign people with the citizenry, as does the U.S. Constitution, and uses the words "people" and "citizens" interchangeably:

> The body politic is formed by a voluntary association of individuals; it is a social compact by which the whole people covenants with each citizen and each citizen with the whole people that all shall be governed by certain laws for the common good. It is the duty of the people, therefore, in framing a constitution of government, to provide for an equitable mode of making laws, as well as for an impartial interpretation and a faithful execution of them; that every man may, at all times, find his security in them.

Mass. Const., preamble (1780). It would be strange if Massachusetts saw power as vested in the people, that is, citizens, and then wished to have others—noncitizens—share in that power by

voting. More likely, perhaps, is that Adams regarded Massachusetts's requirements for voting as a stab at what the requirements for Massachusetts and United States citizenship themselves were or should be.

In keeping with this lack of a clear rule of citizenship, scholars have referred not to a stable tradition, but to "the 'spasmodic' nature of alien suffrage," in American history. Kennedy-Shaffer, Alan, *Voters in a Foreign Land: Alien Suffrage and Citizenship in the United States, 1704-1926*, W&M ScholarWorks, https://dx.doi.org/doi:10.21220/s2-115t-9130 (2009) (quoting Kirk H. Porter, *A History of Suffrage in the United States* 112 (1918)). This haphazard quality is likely due to the fact that "'the line between national and state citizenship during the eighteenth and early nineteenth centuries was not clearly demarcated[.]'" *Id.* (quoting Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18(2) Law & Ineq. 271, 274 (2000)). In any event, states began requiring citizenship as a voter qualification following the War of 1812. *Id.* (quoting Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U Penn Law Review 1391, 1403 (1993)). States admitted to the Union beginning in 1812 "confined the franchise to citizens. Meanwhile, a number of early states" that had not required citizenship for voting "during this same period[] chang[ed] the constitutional definition of voters from 'inhabitants' to 'citizens.'" Raskin, 141 U Penn Law Review at 1404.

Furthermore, while some states did allow noncitizens the right to vote, such permission represented a mere technical infringement on the right to citizen self-government. *See Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 177 (1874) (stating that several states did not require citizenship, allowing "persons of foreign birth, *who have declared their intention to become citizens of the United States*, may under certain circumstances vote.") (emphasis added). By

requiring this pledge, these states acknowledged the spirit of the right even as they violated its letter.

Finally, Defendant's claim that "[t]he District is just the latest jurisdiction to continue the trend" of noncitizen voting falls flat. Doc. 8 at 16. While it is true that several jurisdictions in Maryland permit the practice, noncitizen voting has also been enacted, challenged, and struck down by state courts in New York and California. *See Fossella v. Adams*, 2022 NYLJ LEXIS 1150 (N.Y. 2022) (striking down a law permitting legal permanent residents and those with employment authorization to vote in municipal elections); *Lacy v. City and County of San Francisco*, No. CPF-22-517714 (Cal. 2022) (striking down a municipal law allowing noncitizen parents to vote in school board elections). Indeed, what these cases show is precisely this innovation's collision with the historically "deeply-rooted" nature of citizen self-government.

In short, the history of permitting noncitizen voting is haphazard at best, and can hardly be described as the "'[l]ong settled and established practice'" that defendant alleges. Doc. 8 at 16 (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022)). As such, this history cannot overthrow the deeply-rooted nature of popular sovereignty, and the rights that flow from it, in the Constitution and the basic theory of democracy, as explicated by the Supreme Court time and again. The right of United States citizens to govern, and to be governed by, themselves is fundamental in our system of democracy.

The D.C. Noncitizen Voting Act infringes this fundamental right by its terms, and as explained above serves no compelling interest in doing so. Plaintiffs accordingly have stated a plausible claim for relief from the violation of their right to substantive due process.

## **CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss should be denied.

Dated: July 14, 2023                         Respectfully submitted,

                                             /s/ Christopher J Hajec
                                             Christopher J. Hajec (D.C. Bar No. 492551)
                                             Gina M. D'Andrea (D.C. Bar No. 1673459)
                                             Immigration Reform Law Institute
                                             25 Massachusetts Ave NW, Suite 335
                                             Washington, DC 20001
                                             Tel: 202.232.5590
                                             Email: chajec@irli.org
                                                     gdandrea@irli.org
                                             *Counsel for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 14, 2023, a copy of the foregoing was filed electronically via the Court's CM/ECF filing system. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

/s/ Christopher J. Hajec