# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RALPH CHITTAMS,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **No. 1:23-cv-01261-ABJ** |
| **DISTRICT OF COLUMBIA BOARD OF ELECTIONS,** | |
| **Defendant.** | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

The District of Columbia (District) on behalf of Defendant District of Columbia Board of Elections moves under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' Amended Complaint [33]. A memorandum of points and authorities as well as a proposed order are attached. Because this Motion is dispositive, the District has not sought Plaintiffs' consent. *See* LCvR 7(m).

Date: December 10, 2025

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Assistant Attorney General

Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RALPH CHITTAMS, *et al.*,**<br><br>　　**Plaintiffs,**<br><br>　　**v.**<br><br>**DISTRICT OF COLUMBIA BOARD OF ELECTIONS,**<br><br>　　**Defendant.** | **No. 1:23-cv-01261-ABJ** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 1

    I.    The Voting Act ..................................................................................... 1

    II.    Procedural History .............................................................................. 4

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ....................................................................................................... 6

    I.    Plaintiffs Bear a Heavy Burden Because They Bring a Facial Challenge. ............. 6

    II.    The Substantive Due Process Claim Fails. ........................................ 6

        A.    The Asserted Fundamental Right Is Not a General "Right to Vote" but an Exclusive Right of Citizens to Vote ................................. 8

        B.    An Exclusive Right of Citizens to Vote Is Not Deeply Rooted in This Nation's History and Tradition. ........................................ 10

            1.    There Is a Long History of Non-Citizen Enfranchisement Since the Founding. ....................................................... 10

            2.    Plaintiffs' Allegations and Arguments Fail to Carry Their Burden. ......................................................................... 19

        C.    The Voting Act Has a Rational Basis. ..................................... 21

    III.    The Equal Protection Claims Fail. ................................................... 23

        A.    The Voting Act Is Facially Neutral ......................................... 24

        B.    Plaintiffs Have Not Plausibly Alleged Facts Showing That the Voting Act Has a Discriminatory Purpose ................................. 29

        C.    U.S. Citizens and U.S.-Born Individuals Are Not Suspect Classes .......... 32

    IV.    The "Right to Citizen Self-Government" Claim Fails. ..................... 33

CONCLUSION .................................................................................................... 34

## INTRODUCTION

Since the dawn of the Republic, federal, state, and local governments have extended the franchise to otherwise qualified residents—not just citizens.  Like many jurisdictions before it, the District of Columbia allows all qualified residents, regardless of citizenship, to vote in elections for District offices and measures.  Casting aside the historical pedigree of this democratic enactment, Plaintiffs (U.S. citizens) attack the constitutionality of the District's extension of the franchise, alleging that it violates substantive due process, equal protection, and the never-before-recognized "right to citizen self-government."  In doing so, Plaintiffs urge this Court to strip the right to vote from qualified Washingtonians.

Plaintiffs' claims fail—as a matter of constitutional history and constitutional law. Plaintiffs' substantive due process claim fails because they cannot show that their claim rests on a carefully defined or deeply rooted fundamental right, and Plaintiffs have alleged no facts suggesting that non-citizen enfranchisement fails rational basis review.  Plaintiffs' equal protection claims fare no better because the District's facially neutral election laws do not discriminate against anyone, nothing in Plaintiffs' Amended Complaint suggests that the legislature acted with discriminatory intent, and the election laws do not target a suspect class. Finally, Plaintiffs' "right to citizen self-government" claim fails because no such judicially enforceable right exists.  Thus, the Court should dismiss the Amended Complaint for failure to state a claim.

## BACKGROUND

### I.    The Voting Act

District law prescribes qualifications to vote.  D.C. Code §§ 1-1001.07(a), 1-1001.02(2). Those qualifications had included, as relevant here, that the voter was a U.S. citizen, had reached 18 years of age by the general election, had resided in the District for at least 30 days prior to the

election, and did not claim voting residence or the right to vote in any state or territory. *Id.*
§ 1-1001.02(2) (2021). The citizenship requirement had engendered controversy for decades.[1]
So, in June 2021, the D.C. Council considered a proposal to allow non-citizen voting on local
matters. D.C. Council, Comm. on the Jud. & Pub. Safety, *Report on Bill 24-0300, the "Local
Resident Voting Rights Amendment Act of 2022"* 2–3 (Sept. 27, 2022) (Comm. Rep.),
https://tinyurl.com/49fxd3ha. After studying the issue and its history for more than a year, and
after holding a public hearing at which more than 50 members of the public spoke (no Plaintiffs
among them), the Council found that non-citizen residents "deserve the opportunity to have a
voice in the issues that affect them" because they comprise a meaningful part of the District's
community, workforce, and taxbase, and "they are impacted by local laws just as much as citizen
residents." *Id.* at 3–5; *see id.* at 2–10.

The Council's careful study culminated in the unanimous passage (save one absent vote)
of the Local Resident Voting Rights Amendment Act of 2022 (the Voting Act), D.C. Law 24-
242, 69 D.C. Reg. 14,601 (Dec. 2, 2022). The Voting Act allows adult non-citizens whose
"principal or primary home" is "fixed" in the District to vote on certain matters by removing the
citizenship requirement for "local election[s]." D.C. Code § 1-1001.02(2), (16). The term "local
election" refers to certain District offices, as well as initiatives, referenda, recalls, or charter-
amendment measures. *Id.* § 1-1001.02(34). The Voting Act further provides that District voters

---

[1]     *See, e.g.*, Lawful Permanent Resident Voting Rights Amendment Act of 1992, B9-532
§ 2(3) (May 6, 1992), https://tinyurl.com/2r3m4bcb; Equitable Voting Rights Amendment Act of
2004, B15-0977 § 2 (July 13, 2004), https://tinyurl.com/yzm78kyj; Local Resident Voting Rights
Act of 2013, B20-0597 § 2(b) (Dec. 3, 2013), https://tinyurl.com/bdzf4j5w; Local Resident
Voting Rights Amendment Act of 2015, B21-0028 § 2(a) (Jan. 20, 2015),
https://tinyurl.com/2whjy6z2; Local Resident Voting Rights Amendment Act of 2017, B22-0074
§ 2(a) (Jan. 24, 2017), https://tinyurl.com/3x5sp27j; Local Resident Voting Rights Amendment
Act of 2019, B23-0492 § 2(a) (Oct. 8, 2019), https://tinyurl.com/3hfdu83x.

may not claim voting residence or the right to vote in another country. *Id.* § 1-1001.02(2)(C). In sum, District law allows all residents to vote in local elections, if they meet other existing requirements. And because status as a District voter is a prerequisite to holding elected office, the Voting Act had the effect of making non-citizens eligible to run for certain District offices, if they meet other existing requirements. *See, e.g.*, *id.* §§ 1-204.21(c)(1)(A) (Mayor), 1-301.83(a)(1) (Attorney General), 1-204.02(1) (Councilmember).

In passing the Act, the Council considered whether the District's Board of Elections (Board) could effectively administer the Act. Comm. Rep. at 8–9; *see* D.C. Code § 1-1001.05 (delegating responsibility for administering elections to the Board). In particular, the Council considered whether only legal permanent residents should be allowed to vote. Comm. Rep. at 7. The Council decided, however, to extend the right to vote to all non-citizens, regardless of specific immigration status. *Id.* The Council reasoned that doing so was "easier to administer" for the Board because the Board would not need to verify complex or changing immigration statuses. *Id.* at 8. Further, the Council explained that extending the vote to all non-citizens prevented the Council "from having to distinguish between 'worthy' and 'unworthy' noncitizens based on immigration status, an arbitrary category as it relates to participation and investment in the community." *Id.*

The Voting Act was enacted on November 21, 2022, and transmitted to Congress. Following congressional review, the Act went into effect on February 23, 2023. In 2024, the Board conducted primary and general elections with the Act in place. The elections were fair, accurate, and free. In the words of one first-time, non-citizen voter, "Wow, this is what democracy is like." Ellie Silverman & Jenny Gathright, *In a First, Noncitizens Are Voting in D.C. Here's What It Means to Them*, Wash. Post (June 3, 2024), https://tinyurl.com/54cy5rx7.

## II.    **Procedural History**

The original Plaintiffs in this case are U.S. citizens who, at the time this case began, resided and were registered to vote in the District, two of whom were previously unsuccessful candidates for District office.  Compl. [1-1] ¶¶ 13–19.  The original Plaintiffs sued the Board to challenge the Act in the Superior Court of the District of Columbia.  *Id.* ¶¶ 1–8.  Their Complaint alleged that the Act violates (1) the substantive due process guarantee of the Fifth Amendment, (2) the equal protection guarantee of the Fifth Amendment by discriminating based on citizenship, (3) the equal protection guarantee of the Fifth Amendment by discriminating based on national origin, and (4) the supposed right of citizens to self-government.  *Id.* ¶¶ 55–70.  The Complaint sought declaratory and injunctive relief.  *Id.*, Prayer.

After removing to this Court, the District moved to dismiss for lack of standing or failure to state a claim.  Not. of Removal [1]; Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss [8] at 1.  The Court dismissed the Complaint for lack of standing and did not reach the Rule 12(b)(6) grounds for dismissal.  *Hall v. D.C. Bd. of Elections*, No. 23-cv-1261, 2024 WL 1212953, at *1 (D.D.C. Mar. 20, 2024).  The Court concluded that Plaintiffs failed to allege that "they have personally been subjected to any sort of disadvantage as individual voters by virtue of the fact that noncitizens are permitted to vote, too." *Id.* at *4.

Plaintiffs appealed [21], and the District cross-appealed [23].[2]  The D.C. Circuit reversed and remanded.  *Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 203 (D.C. Cir. 2025).  The Circuit

---

[2]    The District cross-appealed because dismissal for lack of standing under Rule 12(b)(1) is typically without prejudice, while dismissal for failure to state a claim under Rule 12(b)(6) is typically with prejudice.  *See Mark v. Republic of the Sudan*, 77 F.4th 892, 899 (D.C. Cir. 2023).  Affirming the dismissal of Plaintiffs' suit on the merits would have altered the judgment under review by requiring dismissal with prejudice, and an appeal is generally required to alter a judgment.  *See* 15A Charles Alan Wright, et al., *Federal Practice and Procedure* § 3904 & n.12 (3d ed. June 2024).

reasoned that Plaintiffs alleged a sufficiently particularized injury because "granting the franchise to noncitizens will expand the D.C. electorate and reduce the voting power of each U.S. citizen voter in local elections." *Id.* at 206.  The Circuit further held it could infer that one Plaintiff, Stacia Hall, intended to vote in future elections, so at least Hall had plausibly alleged standing. *Id.* at 208–09.  The Circuit did not address the District's cross-appeal. *Id.* at 209.

Following remand, this Court, at the Parties' request, entered a briefing schedule for the District to renew its Rule 12(b)(6) motion.  Aug. 7, 2025, Min. Order.  The District filed its renewed motion to dismiss [29].  Plaintiffs opposed [31] and simultaneously moved to amend their Complaint to remove Stacia Hall as a Plaintiff and add a few allegations aimed at shoring up jurisdiction in light of the D.C. Circuit's opinion [32].  The Court granted the motion to amend and denied the District's renewed motion to dismiss as moot.  Nov. 26, 2025 Min. Orders.  Pursuant to Fed. R. Civ. P. 15(a)(3), the District moves to dismiss the Amended Complaint.

## LEGAL STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Courts need not accept as true conclusory "assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 679, or "legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).  A dismissal for failure to state a claim is appropriate when a plaintiff's claims are premised on mistakes of law, including mistakes about the rights conferred by the Constitution.  *See Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."); *Medina v. Whitaker*, 913 F.3d 152, 154 (D.C. Cir. 2019) (affirming Rule 12(b)(6) dismissal of challenge to

federal felon-in-possession ban because the Second Amendment does not extend to felons);

*Tuaua v. United States*, 951 F. Supp. 2d 88, 90 (D.D.C. 2013) (dismissing claims when the

"[u]nderlying" "legal argument" about the Constitution's meaning was wrong), *aff'd*, 788 F.3d

300 (D.C. Cir. 2015).

## ARGUMENT

## I.    Plaintiffs Bear a Heavy Burden Because They Bring a Facial Challenge.

Plaintiffs bring a facial challenge, and "under longstanding precedent, such challenges

are quite difficult to make out." *Newman v. Moore*, 151 F.4th 472, 483 (D.C. Cir. 2025).  A

facial challenge to a statute "asks a court to look beyond the facts of [a plaintiff's] own case and

declare a statutory provision unconstitutional in all its applications." *Id.*  The Amended

Complaint asks for the Voting Act to "be struck down," Am. Compl. ¶ 7, that is, for the Court to

prohibit the District from enforcing it in its entirety, *id.*, Prayer ¶ 2.  And the Amended

Complaint alleges that the Court should do so on the ground that the Act violates every District-

residing citizen's or U.S.-born individual's rights.  *See, e.g.*, *id.* ¶¶ 50, 60, 64, 67.  Because

Plaintiffs "seek to enjoin [the Act's] enforcement altogether," they plainly bring a facial

challenge and must meet the standard for such challenges.  *Anderson v. Edwards*, 514 U.S. 143,

155 n.6 (1995).  Under that standard, Plaintiffs "must establish that no set of circumstances exists

under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Turning to the claims with that standard in mind, it quickly becomes apparent that Plaintiffs

cannot meet the standard.  *See Newman*, 151 F.4th at 478, 482–85 (affirming dismissal on the

pleadings when the plaintiff failed to meet the standard for facial challenges).

## II.    The Substantive Due Process Claim Fails.

Plaintiffs' first claim invokes the "controversial" doctrine of substantive due process.

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237 (2022); *see* Am. Compl. ¶ 55.  The

Due Process Clause of the Fifth Amendment, which is applicable to the District, provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Clause encompasses "a substantive component" that protects certain fundamental unenumerated rights.  *Reno v. Flores*, 507 U.S. 292, 302 (1993).

But this "doctrine of substantive due process is narrow."  *Fraternal Ord. of Police v. District of Columbia*, 45 F.4th 954, 962 (D.C. Cir. 2022).  To show that an unenumerated right is "fundamental," Plaintiffs must show that their asserted interest—when carefully defined—is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation modified).  Only if Plaintiffs make that rigorous showing is heightened judicial scrutiny warranted; otherwise, rational basis review applies.  *Dep't of State v. Munoz*, 602 U.S. 899, 910–11 (2024).

"Identifying [new] unenumerated rights carries a serious risk of judicial overreach, so this Court 'exercise[s] the utmost care whenever [it is] asked to break new ground in this field.'"  *Id.* at 910 (second alteration in original) (quoting *Glucksberg*, 521 U.S. at 720).  Thus, to determine whether Plaintiffs have invoked a fundamental right protected by substantive due process, the Court follows a "two-step inquiry."  *Id.*  First, the Court "insists on a 'careful description of the asserted fundamental liberty interest.'"  *Id.* (quoting *Glucksberg*, 521 U.S. at 721).  Second, the Court determines whether the asserted fundamental liberty interest is "objectively, deeply rooted in this Nation's history and tradition."  *Id.* (quoting *Glucksberg*, 521 U.S. at 721).

Carefully defined, Plaintiffs invoke an alleged right to vote in an election in which only citizens vote.  But no such right has existed in this Nation's history.  As a result, the asserted

right is not fundamental, so the Voting Act need only have a conceivable rational basis, which the Act does.

A.      **The Asserted Fundamental Right Is Not a General "Right to Vote" but an Exclusive Right of Citizens to Vote.**

Substantive due process cases "must begin with a careful description of the asserted right." *Flores*, 507 U.S. at 302. This "threshold requirement of a carefully described right" is critical to ensuring "responsible decisionmaking" in the "uncharted area" of substantive due process. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 701 n.5, 702 (D.C. Cir. 2007) (en banc) (citation modified). Under this framework, a "broad generalization" will not suffice. *Id.* at 701 n.5. The right instead must be defined with specific reference to the "plainly pertinent fact[s]" of the case at hand. *Hedgepeth ex rel. Hedgepeth v. WMATA*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.); *see id.* at 1155–56 (rejecting the plaintiff's asserted "right to freedom from restraint" in favor of "the right of freedom of movement when there is probable cause for arrest"); *Munoz*, 602 U.S. at 910 (rejecting plaintiff's invocation of a "right to marriage" in favor of "the right to reside with her noncitizen spouse in the United States" (emphasis omitted)).

Two cases help to illustrate this careful description requirement. In *Glucksberg*, the plaintiffs challenged a state law prohibiting physician-assisted suicide on the theory that it violated the fundamental "right to die." 521 U.S. at 722. But the Supreme Court rejected that formulation and instead defined the interest more narrowly as "a right to commit suicide with another's assistance." *Id.* at 724. That formulation more precisely reflected what the state law prohibited. *Id.* at 723. Likewise, in *Flores*, the plaintiffs argued that detaining undocumented juvenile-arrestees who have no domestic guardians violated the fundamental "right to 'freedom from physical restraint.'" 507 U.S. at 299–300. Yet the Court rejected that definition, too, in

8

favor of the narrower "right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* at 302. As these decisions—plus this Court's own decisions—make clear, the right asserted in a substantive due process case must be defined with precision in light of the nature of the challenged law and the specific facts alleged. *See Sobin v. District of Columbia*, No. 19-cv-2580, 2020 WL 4732098 (D.D.C. Aug. 14, 2020) (Berman Jackson, J.) ("[I]t is important for the Court 'to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake and what the city allegedly did to deprive [them] . . . of that right.'" (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992))).

Here, Plaintiffs appear to invoke a "right to vote" and a "right to citizen self-government." Am. Compl. ¶¶ 44, 56; Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss (Pls.' 1st Opp'n) [12] at 19. But that abstract description ignores "plainly pertinent fact[s]," *Hedgepeth*, 386 F.3d at 1155, and "the allegations in the [C]omplaint," *Collins*, 503 U.S. at 125.[3] As this Court already explained, Plaintiffs have not alleged that they have been "denied" the right to vote. *Hall*, 2024 WL 1212953, at *4. The Voting Act does not deny them the right to vote—they can still vote in District elections. Instead, Plaintiffs' allegation is more precisely that the Act dilutes their votes because their votes are counted along with non-citizens' votes. *Id.*; *see also* Am. Compl. ¶¶ 5, 45. Properly formulated, then, the right underlying Plaintiffs' substantive due process claim is a purported right to have one's vote counted without the

---

[3]    If the right at issue is "the right to vote," then Plaintiffs' claim fails at the threshold because "the right to vote, *per se*, is not a constitutionally protected right." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973)).

presence of non-citizens' votes.  In Plaintiffs' own words, they assert "the *exclusive* right" of citizens to vote.  Pls.' 1st Opp'n at 11 (emphasis added).

**B.** **An Exclusive Right of Citizens to Vote Is Not Deeply Rooted in This Nation's History and Tradition.**

Plaintiffs bear the burden to show that a right of citizens to vote exclusively is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (citation modified); *see Abigail*, 495 F.3d at 703 (the plaintiff "must show" that the right is deeply rooted).  To carry that burden, Plaintiffs must come forward with a "long history of such a right."  *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 72 (2009).  "[T]he mere novelty of such a claim is reason enough to doubt that substantive due process sustains it."  *Id.* (quoting *Flores*, 507 U.S. at 303).

Rather than a long history of exclusive citizen voting, there is a long history of non-citizen enfranchisement.  Given non-citizen enfranchisement's "history and prevalence," it cannot violate "plaintiffs' substantive due process rights."  *Fox v. District of Columbia*, 851 F. Supp. 2d 20, 32 (D.D.C. 2012) (Berman Jackson, J.).

**1.** **There Is a Long History of Non-Citizen Enfranchisement Since the Founding.**

At the Founding and in early American history, voting was not limited to citizens. Gerald L. Neuman, *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law* 63–65 (1996).  "The practice of noncitizen voting first appeared in the colonies, which generally required only that voters be local inhabitants or residents, and not British citizens."  Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1399 (1993) (citation modified).  Unnaturalized immigrants voted and held office as early as 1692.  James H. Kettner, *The Development of American Citizenship 1608-1870* 122-23 (1978) (discussing Maryland, Pennsylvania, Georgia,

and South Carolina).  "Alien suffrage survived the Revolution in 1776 as many states granted

foreigners state 'citizenship' . . . ."  Raskin, *supra*, at 1400; *see also, e.g.*, Ron Hayduk,

*Democracy for All: Restoring Immigrant Voting Rights in the United States* 16–17 (2006); Alan

H. Kennedy, *Voters in a Foreign Land: Alien Suffrage in the United States, 1704-1926*, 34 J.

Policy History 245, 249–51 (2022).

The Founders themselves wrote the voting rights of non-citizens into the first state

constitutions, which granted "persons," "inhabitants," or "residents" voting rights regardless of

citizenship.  Hayduk, *supra*, at 15–17, 19–20.  These constitutions provide weighty evidence of

the federal Constitution's meaning.  *See District of Columbia v. Heller*, 554 U.S. 570, 603 (2008)

(stating that right-to-bear-arms provisions in seven early state constitutions were "strong

evidence" of "how the founding generation conceived of the right"); *Moore v. Harper*, 600 U.S.

1, 32–33 (2023) (relying on early state constitutions to construe the Constitution's Elections

Clause).

To illustrate, the 1780 Massachusetts Constitution, written by John Adams, conditioned

the franchise on gender, residency, age, and property ownership, but not citizenship:

> Every male person being twenty-one years of age, and resident in
> any particular town in this commonwealth, for the space of one year
> next preceding, having a freehold estate within the same town, of
> the annual income of three pounds, or any estate of the value of sixty
> pounds, shall have a right to vote in the choice of a representative or
> representatives for the said town.

Mass. Const. pt. 2, ch. I, § 3, art. IV, at 30 (1780), https://tinyurl.com/33n9dtw4.[4]  Several other

original states had similar constitutional provisions.  N.J. Const. art. IV (1776),

---

[4]    Of course, some of these conditions, like gender and age, would be unconstitutional today
due to later amendments that expressly prohibited these conditions.  *See, e.g.*, U.S. Const.
amend. XV, XIX, XXVI.  And it cannot be overlooked that states for much of the Nation's

https://tinyurl.com/mw7rd4dk; Md. Const. art. II (1776), https://tinyurl.com/43kucsvt; N.Y.

Const. art. VII (1777), https://tinyurl.com/2frxau3s; Del. Const. art. IV, § 1 (1792),

https://tinyurl.com/4vawu3uw; N.H. Const. pt. 1, art. 11, pt. 2, art. 27 (1792),

https://tinyurl.com/yc5mv3sy.  Other original states granted voting rights to landowning

"inhabitants."  N.C. Const. art. VII–IX (1776), https://tinyurl.com/yn5yxunp; Ga. Const. art. IX

(1777), https://tinyurl.com/mr2dw578; S.C. Const. art. I, § 4 (1790),

https://tinyurl.com/mu7tkmv5.   Still other original states focused on community attachment as

the qualifier, such as the Virginia Constitution's Declaration of Rights, written principally by

George Mason, which proclaimed that "all men, having sufficient evidence of permanent

common interest with, and attachment to, the community, have the right of suffrage."  Va. Decl.

of Rts. § 6 (1776), https://tinyurl.com/m97k7zpr; *see also* Pa. Decl. of the Rts. of the Inhabitants

of the Commw. art. VII (1776), https://tinyurl.com/yc5pyecv; Vt. Const. ch. 1, art. 8 (1793),

https://tinyurl.com/me8c59zc.  And several of the first states to enter the Union continued the

practice with similar provisions.  Tenn. Const. art. III, § 1 (1796), https://tinyurl.com/nhb7xu5j;

Ohio Const. art. IV, § 1 (1802), https://tinyurl.com/5n7tjjpb; Ill. Const. art. II, § 27 (1818),

https://tinyurl.com/rty3sw2s.  All said, Plaintiffs cannot show that the Founding generation

---

history conditioned the franchise on race.  Hayduk, *supra*, at 16.  It took years, war, constitutional amendments, popular movements, and legislation to extend the franchise to all races; and the project continues today.  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 692–96 (2021) (Kagan, J., dissenting).  By citing the provisions above, the District does not condone their unconstitutional and abhorrent conditions.  But what is important for this case is that none of these provisions conditioned voting on citizenship, as Plaintiffs suggest is constitutionally required.  In accord, courts performing historical analyses, including the D.C. Circuit, have relied on historical laws that would nonetheless be unconstitutional today under other provisions.  *See, e.g.*, *Medina*, 913 F.3d at 159 (relying on loyalty oaths to construe the Second Amendment); *Kanter v. Barr*, 919 F.3d 437, 458 & n.7 (7th Cir. 2019) (Barrett, J., dissenting) (relying on disarmament laws based on race, religion, or beliefs to construe the Second Amendment).

would have thought non-citizen enfranchisement unconstitutional when the Founders themselves could vote alongside non-citizens.

The early federal government also allowed non-citizen voting.  Chilton Williamson, *American Suffrage from Property to Democracy 1760-1860* 277 (1960).  For example, the First Congress provided that men were qualified "as an elector" in the Northwest Territory if they owned "fifty acres of land" and had "two years residence."  Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51 n.(a), https://tinyurl.com/5n74npwc (readopting the 1787 Northwest Ordinance promulgated under the Articles of Confederation).  The Ordinance thus "gave freehold aliens who had been residents for two years the right to vote for representatives to territorial legislatures."  Raskin, *supra*, at 1402.  Congress also gave "aliens as well as citizens the right of electing and being elected to office" in other territories.  *Spragins v. Houghton*, 3 Ill. 377, 394 (1840); *see id.* (discussing, among other laws, the Ohio Enabling Act of 1802, ch. 15, § 4, 2 Stat. 174 (Apr. 30, 1802)); Raskin, *supra*, at 1402 (noting that Congress "extended the right to vote to aliens" in various laws "authorizing the election of representatives to statewide constitutional conventions in Ohio, Indiana, Michigan and Illinois").  And in the District, Congress granted taxpaying "inhabitants of full age" the right to vote for city-council members, regardless of citizenship.  Act of May 3, 1802, ch. 53, § 2, 2 Stat. 196 (1802), https://tinyurl.com/3cutfd8t.

When territories tried to become states, Congress admitted them into the Union with full understanding that they allowed non-citizen voting.  Congress, for instance, allowed the then-territory of Illinois to form a constitutional convention on the condition that it establish a "republican" government, Act of April 18, 1818, ch. 67, § 4, 15 Stat. 430, which was understood to mean a representative government that "derives all its powers directly or indirectly from the great body of the people," Federalist No. 39 (Madison) (1788), https://tinyurl.com/4av9km33.

And when Illinois submitted a constitution allowing non-citizen "inhabitants" to vote, *see* Ill. Const. art. II, § 27, Congress did not hesitate to declare Illinois's government "republican," 15 Stat. 536 (Dec. 3, 1818); *see Spragins*, 3 Ill. at 392–95 (discussing similar histories with Ohio, Indiana, and Michigan). Implicit in that determination is a considered judgment by the federal government early in this Nation's history that non-citizen voting was consistent with the American conception of popular sovereignty. *See* Neuman, *supra*, at 64, 143 (recognizing that "popular sovereignty" in the United States has historically been "flexible" and that "the Constitution does not provide a single 'conception of a political community'"). That judgment "commands our respect." *Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978, 1001 n.10 (D.C. Cir. 2025) (quoting *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025)). Indeed, all these actions of early congresses, especially the First, "provide[ ] contemporaneous and weighty evidence of the Constitution's meaning." *Seila L. LLC v. CFPB*, 591 U.S. 197, 214 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986)); *see also, e.g.*, *Munoz*, 602 U.S. at 912 (relying on a 1798 enactment by Congress to hold that an asserted right was not deeply rooted); *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (holding that evidence of early congressional enactments adopting recusal rules was "dispositive" against claim that recusal rules were unconstitutional).

All the while, the Founders could have put a citizenship requirement for voting in either the federal or state constitutions, but they did not. Since the Founding, there has been a concept of national citizenship, and citizenship was conceived of as something different from residency. *Minor v. Happersett*, 88 U.S. 162, 165–66 (1874); *see also Stewart v. Foster*, 2 Binn. 110, 121 (Pa. 1809); *Spragins*, 3 Ill. at 404; Gerald L. Neuman, *"We are the People": Alien Suffrage in German and American Perspective*, 13 Mich. J. Int'l L. 259, 292 (1992). The Constitution

empowered Congress "[t]o establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8.

And the First Congress exercised that power by passing a statute signed by President Washington

defining who could become a U.S. citizen.  Naturalization Act of 1790, 1 Stat. 103.  Further, the

Constitution uses citizenship as a qualification at several points.  *E.g.*, U.S. Const. art. I, §§ 2–3

(qualifications for U.S. representatives and senators); *id.* art. II, § 1 (qualifications for President).

Thus, the drafters of the federal Constitution knew how to impose citizenship requirements when

they wanted to but did not do so for voting.  That choice refutes any assertion that citizenship is a

deeply rooted qualification for voting.  *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983)

("[W]here Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion." (citation omitted)).

Moving past the Nation's early days, non-citizen enfranchisement's prevalence fluctuated

over time, as with any policy.  *See, e.g.*, Raskin, *supra* at 1397–1417.  After the War of 1812,

some states limited voting to citizens or so-called "declarant aliens"—non-citizens who declared

their intention to become citizens.  Neuman, *supra*, at 65–66.  But after the Civil War, the

"movement to enfranchise aliens reached its height."  Williamson, *supra*, at 277.  Many states in

the postbellum period continued to allow foreign-born residents to vote and hold local office

regardless of whether they were U.S. citizens.  *See, e.g.*, *McCarthy v. Froelke*, 63 Ind. 507, 508–

12 (1878) (upholding election of Prussia native to "township trustee" as he was "a voter under

the constitution of the State of Indiana, though not a citizen of the United States"); *Linger v.

Balfour*, 149 S.W. 795, 800–01 (Tex. Civ. App. 1912) (holding that "alien" who "declared his

intention of becoming a citizen" was "a qualified elector and eligible to" serve as county clerk).

And this makes historical sense given that "alien soldiers fought for the North [*i.e.*, the Union] in

the Civil War and that alien voters were among the People who adopted the Civil War Amendments." Neuman, *supra* at 69. With the onset of World War I and anti-foreign sentiment, states shifted away from non-citizen voting by 1926. Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Pol. Sci. Rev. 114, 114 (1931).

Yet, by the end of the 20th century, cities and towns again began to allow non-citizens to vote in certain local elections. *See* Kennedy, *supra*, at 268–69; Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18 Law & Ineq. 271, 310–22 (2000). Chicago, New York City, and Arlington, Virginia, were early proponents of allowing non-citizens to vote. *See, e.g.*, Charles W. Hall, *Noncitizens Prepare to Vote in Arlington Primary School Board*, Wash. Post, at B4 (May 22, 1994), https://tinyurl.com/2e522uex. And since the early 1990s, towns and cities have likewise expanded non-citizen voting. *See, e.g.*, Takoma Park, Md., Mun. Charter, art. VI, § 601(a); Vt. Act No. M-5 (H.177, Montpelier) (eff. June 24, 2021); *Lacy v. San Francisco*, 312 Cal. Rptr. 3d 391, 395–96 (Ct. App. 2023) (upholding San Francisco law allowing non-citizen parents to vote in schoolboard elections).

In accord, current federal statutory law contemplates that states and localities may allow non-citizen voting in state and local elections. Federal law prohibits non-citizen voting "in any election held solely or in part for" federal offices *unless* "(1) the election is held partly for some other purpose; (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices." 18 U.S.C. § 611(a). Congress thus expressly allows state and local governments to authorize non-citizen voting pursuant to a "statute or a local ordinance" "for some other purpose" besides electing federal officeholders. *Id.*; *see Lacy*,

16

312 Cal. Rptr. at 409 n.26 (citing 18 U.S.C. § 611(a) when rejecting challenges to non-citizen enfranchisement law).

Congress's allowance is consistent with how courts have viewed non-citizen voting, as "it has been unquestionably constitutional" for jurisdictions "to permit aliens to vote." Kirk H. Porter, *A History of Suffrage in the United States* 121 (1918). Courts in the early Republic recognized and enforced the statutory rights of non-citizens to vote under local or state law. *E.g.*, *Stewart*, 2 Binn. 110; *Spragins*, 3 Ill. at 408. As one state high court explained in 1840, the legality of non-citizen voting had been "undisputed" and "settled" in that state for decades and was "no longer an open or debatable" issue. *Spragins*, 3 Ill. at 391–92; *see id.* 406–07 (holding that foreign-born resident "was a legal, qualified voter" even if "not a citizen of the United States"). Judicial recognition and allowance of non-citizen voting continued throughout the 19th century and into the 20th century.[5] By the same token, courts recognized that states could freely choose as a matter of policy to allow non-citizens to hold public office. *See, e.g.*, *Woodcock v. Bolster*, 35 Vt. 632, 637–41 (1863) (upholding the "wise policy" of giving "unnaturalized foreigners" a "limited right to vote and hold office" in school elections). The fact that non-

---

[5]    *See, e.g.*, *Lynch v. Clarke*, 1 Sand. Ch. 583, 661–62, 1844 WL 4808, at *53 (N.Y. Ch. 1844) (noting that many states gave "aliens the right of suffrage" and that "our national legislation" allowed certain "alien inhabitants to vote, if they were freeholders"); *In re Wehlitz*, 16 Wis. 443, 446–48 (1863) (acknowledging that a "state may confer the right to vote" on "an alien"); *Van Valkenburg v. Brown*, 43 Cal. 43, 51 (1872) (noting that in many states "unnaturalized foreigners were by State laws allowed to vote—following in this respect the early policy of the Federal Government"); *United States v. Hirschfield*, 26 F. Cas. 328, 329 (C.C.S.D.N.Y. 1876) ("Some aliens who have never been admitted to become citizens are entitled to vote."); *People v. Scott*, 22 N.W. 274, 274 (Mich. 1885) ("[T]here are in this state many electors of foreign birth who have never been naturalized."); *State v. Fowler*, 6 So. 602, 602 (La. 1889) (noting that a "state, in the exercise of its sovereignty, can confer the right to vote, can make an alien an elector"); *Connell v. State*, 144 N.E. 882, 884 (Ind. 1924) (reiterating that an otherwise-qualified person "could not be excluded from an office because of not being a citizen of the United States").

citizen enfranchisement by the states and localities has long been and is still treated as "a matter of legislative grace" strongly cuts against a conclusion that the practice implicates a "fundamental right" that legislation cannot touch. *Munoz*, 602 U.S. at 916 (citation modified).

In fact, contrary to Plaintiffs' suggestion, Am. Compl. ¶ 52, the Supreme Court has signaled at several points that the practice *is* constitutional, Raskin, *supra*, at 1417. In 1874, the Court observed that "citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage," and in at least ten states, "persons of foreign birth, who have declared their intention to become citizens of the United States, may under certain circumstances vote." *Minor*, 88 U.S. at 177. In the early 20th century, the Court explained:

> the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, . . . provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution. The state might provide that persons of foreign birth could vote without being naturalized . . . .

*Pope v. Williams*, 193 U.S. 621, 632 (1904) (internal citation omitted). And in the late 20th century, the Court stated that citizenship is a "*permissible* criterion," thus implying that citizenship is not a *necessary* criterion to voting. *Sugarman v. Dougall*, 413 U.S. 634, 649 (1973) (emphasis added).

At the same time, courts have never endorsed Plaintiffs' supposed right to exclusive citizen voting. Instead, it is widely accepted that nothing in the Constitution "precludes the states from granting the franchise to noncitizens." Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. Rev. 54, 57 (1997); *see also Chen v. City of Houston*, 206 F.3d 502, 523 n.16 (5th Cir. 2000) (finding "no provision of the Constitution which expressly or by clear implication prohibits the states from extending the franchise to lawfully resident aliens"); Michael C. Dorf, *Equal Protection Incorporation*, 88 Va. L. Rev. 951, 977 n.78 (2002) (observing that "alien disenfranchisement" is not "constitutionally required");

David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Meaning of Zadvydas v. Davis*, 2001 Sup. Ct. Rev. 47, 85 & n.104 (recognizing that "[n]one" of the "constitutional amendments that touch on voting rights" "requires that the franchise be restricted to citizens"). Yet, a right is not deeply rooted when it has not been recognized by courts, *Dobbs*, 597 U.S. at 241; challenges to similar laws have been rejected (even if not on federal constitutional grounds), *Abigail*, 495 U.S. at 710; or the Supreme Court has recognized the government's power to act in ways that are contrary to the right, *Munoz*, 602 U.S. at 914–15 All are true here.

   In sum, local, state, and federal governments have enfranchised non-citizens since the Founding and throughout American history. Courts—including the Supreme Court—have either endorsed non-citizen voting or at least never questioned its constitutionality. And in recent years, localities have reinvigorated the practice. The District is just the latest jurisdiction to continue the trend. Given this history, Plaintiffs cannot carry their burden to show that the Constitution prohibits non-citizen enfranchisement laws.

### 2.    Plaintiffs' Allegations and Arguments Fail to Carry Their Burden.

   To nonetheless contend that a right to exclusive citizen voting is deeply rooted, Plaintiffs have relied on a smattering of sources and arguments, but none suffices to carry their burden.

   Plaintiffs have chiefly relied on a few lines from a handful of modern cases to assert that these cases recognize a "right of citizen self-government." Am. Compl. ¶ 52; Pls.' 1st Opp'n at 9–10. But Plaintiffs cannot carry their historical burden by stretching language from modern judicial opinions. *See Glucksberg*, 521 U.S. at 723–26 (declining to recognize a right based on respondents' reading of cases involving different rights); *Kerry v. Din*, 576 U.S. 86, 93–95 (2015) (plurality) (declining to fashion a new right out of "borrow[ed] language" from "inapposite cases" that "indulged a propensity for grandiloquence"); *Williams v. Att'y Gen. of*

*Ala.*, 378 F.3d 1232, 1236–38 & n.7 (11th Cir. 2004) (declining "to infer a new fundamental right" from "scattered *dicta*"); *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992) ("[A] respect for stare decisis does not require the most expansive application of principles enunciated in a prior decision.").

Moreover, Plaintiffs' cases hurt them more than those cases help them, as the weakness of Plaintiffs' theory is underscored by the cases they rely on most: *Foley v. Connelie*, 435 U.S. 291 (1978), *Ambach v. Norwick*, 441 U.S. 68 (1979), and *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982). None of those cases involved non-citizen voting. Rather, those decisions held that states *may*, consistent with equal protection, impose citizenship requirements for police officers, *Foley*, 435 U.S. at 292; schoolteachers, *Ambach*, 441 U.S. at 69; and probation officers, *Cabell*, 454 U.S. at 445. But they did not declare such laws constitutionally mandated, much less hold that each citizen possesses an individual right to invalidate extensions of the franchise to non-citizens. *See Toll v. Moreno*, 458 U.S. 1, 12 n.17 (1982) (noting the permissive nature of these decisions). Indeed, the statute in *Ambach* would, on Plaintiffs' theory, be riddled with unconstitutional loopholes, including "exemptions" for "aliens who are not yet eligible for citizenship" and allowances "for situations where a particular alien's special qualifications as a teacher outweigh" the citizenship requirement. 441 U.S. at 70, 81 n.15. And the *Ambach* Court acknowledged that New York City allowed "aliens who are parents" to "vote for and sit on certain local school boards," and it suggested that the city had "a rational basis" for doing so, *id.* at 81 n.15—an observation that would be unthinkable if citizens had an unenumerated right to vote in elections in which only citizens vote. Further still, all these cases were equal protection cases. *Id.* at 69; *Foley*, 435 U.S. at 292; *Cabell*, 454 U.S. at 434–35. So they could not have

recognized any substantive due process right when the doctrine of substantive due process was wholly unaddressed in each case.

Plaintiffs have also argued that the "right to citizen self-government" is "set forth" "in the text of" the Preamble, the Supremacy Clause, and the Declaration of Independence.  Pls.' 1st Opp'n at 19.  This Court will search the Preamble, Supremacy Clause, and Declaration in vain for the phrase "right to citizen self-government."  Nor can a right be deemed "fundamental" on the theory that it "could be found *somewhere* in the Constitution," *Dobbs*, 597 U.S. at 235— much less *somewhere* in the Declaration of Independence.  That is particularly so since neither the Preamble, nor the Supremacy Clause, nor the Declaration confers enforceable legal rights. *See, e.g.*, *Heller*, 554 U.S. at 579–80 (Preamble); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (Supremacy Clause); *Rhode Island v. Massachusetts*, 37 U.S. 657, 680 (1838) (Declaration).  Anyway, Plaintiffs' argument is beside the point because the Constitution's guarantee of certain rights to "citizens" does not invariably make those rights *exclusive* or preclude the citizens themselves from extending such rights to others by statute. Plaintiffs' contrary assertions find no support in the Constitution's text or history.  *See* Neuman, *supra*, at 145 (noting that "popular sovereignty in the United States" has never "restricted political power by a rigid definition of the People, and certainly not by the legal category of national citizenship").

### C. The Voting Act Has a Rational Basis.

Because the Act does not burden any fundamental right, it need only satisfy rational basis review.  *Glucksberg*, 521 U.S. at 721; *see May v. Town of Mountain Village*, 132 F.3d 576, 580 (10th Cir. 1997) (applying "rational basis test" in upholding "nonresident voting provisions"); *Duncan v. Coffee County*, 69 F.3d 88, 94 (6th Cir. 1995) (similar and agreeing with the Fifth and Eleventh Circuits).  Under that standard, a law is presumptively constitutional and "must be

upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis' for the legislative choice." *Sanchez v. Off. of State Superint. of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Accordingly, Plaintiffs bear the burden to "plausibly alleg[e] that no conceivable set of facts could support the challenged policy." *Id.* This is a "demanding standard" for Plaintiffs to meet. *Id.* at 395.

They do not meet it. The Council reasonably concluded that allowing "non-citizen residents to have a voice in the government that makes decisions directly affecting them and their families" would improve democracy in the District. Comm. Rep. at 3. As the Council explained, non-citizen residents "are essential to the fabric of our community," they "are impacted by local laws just as much as citizen residents are," and they pay tens of millions of dollars in taxes. *Id.* at 3–4. The Council thus concluded that such residents, "like citizens, deserve the opportunity to have a voice in the issues that affect them." *Id.* at 4.

That egalitarian choice was rational and related to the legitimate government interest in expanding democratic participation. *See Duncan*, 69 F.3d at 94 (finding that the expansion of the franchise "is not irrational" if the newly included voters have "a substantial interest" in the pertinent elections); *cf. Utah Republican Party v. Cox*, 892 F.3d 1066, 1085 (10th Cir. 2018) ("How could it not be true in a representative democracy such as ours that the State has a strong—even compelling—interest in ensuring that the governed have an effective voice in the process of deciding who will govern them?"). The Council further rationally concluded that this logic extends beyond lawful permanent residents because including all non-citizens was "easier to administer for the Board" and because "immigration status" does not determine a person's "investment in the community." Comm. Rep. at 7–8; *see Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 220 (1st Cir. 1994) ("administrative convenience" is a rational basis for legislative

action).  Nor is there anything fundamentally unfair about the Council's considered judgment to enfranchise non-citizens given that the Voting Act preserves Plaintiffs' ability to cast their own ballots as they wish.  *See Bennett v. Yoshina*, 140 F.3d 1218, 1227 (9th Cir. 1998) (holding that a method of counting ballots caused no "disenfranchisement or meaningful vote dilution" or "fundamental unfairness" when "every ballot submitted was counted and no one was deterred from going to the polls"); *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 828 (1st Cir. 1980) (per curiam) (similar).  Thus, Plaintiffs fail to "plausibly alleg[e] that no conceivable set of facts could support" the Voting Act.  *Sanchez*, 45 F.4th at 396.

III.    **The Equal Protection Claims Fail.**

Plaintiffs' equal protection claims fare no better and fail at each step of the analysis.  The Due Process Clause of the Fifth Amendment is interpreted to provide an equal protection guarantee.  *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987).  Equal protection "provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others." *Jones v. Helms*, 452 U.S. 412, 423–24 (1981).  If a law treats a suspect class differently, then it must survive strict scrutiny.  *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025).  If, however, the law does not target a suspect class, then it need only pass rational basis review.  *Id.*  "Generally speaking, laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause." *Vacco v. Quill*, 521 U.S. 793, 800 (1997) (citation modified).

As relevant here, an equal-protection challenger can show differential treatment in two ways.  First, the challenger can show that a law "expressly classified individuals based on" their membership in a suspect class.  *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016).  In other words, the challenger can show that the law discriminates "on its face." *Id.* Second, if the law is facially neutral, the challenger can nonetheless show that the law is

discriminatory in its purposes and effects. *Id.* That is, and to use race as an example, laws trigger strict scrutiny if they "result in racially disproportionate impact *and* are motivated by a racially discriminatory purpose." *Id.* (emphasis added) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 213 (1995)).

Here, Plaintiffs allege that the Voting Act discriminates against U.S. citizens or U.S.-born individuals. *See* Am. Compl. ¶¶ 58–65. Those claims fail because (1) the Act is facially neutral, (2) Plaintiffs have not plausibly alleged facts showing a discriminatory purpose, and (3) U.S. citizens and U.S.-born individuals are not suspect classes. Accordingly, the Act need only pass rational basis review, which it does for the reasons given above. Argument § II.C, *supra*.[6]

## A.     The Voting Act Is Facially Neutral.

Nothing on the face of the Voting Act treats citizens or U.S.-born Americans differently or worse than non-citizens or foreign-born Americans.[7] A statute discriminates on its face when it "imposes an express . . . classification" that "provide[s] for preferential treatment" of one class. *Rothe*, 836 F.3d at 64. On the flip side, a statute is facially neutral when its text draws no "distinction among people based on a particular characteristic." Erwin Chemerinsky, *Constitutional Law* 726 (6th ed. 2019); *see In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir.

---

[6]     The long history of non-citizen enfranchisement also counsels against finding an equal protection violation here because "[w]hen faced with a dispute about the Constitution's meaning or application, '[l]ong settled and established practice is a consideration of great weight.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).

[7]     The Court can assume without deciding that citizens and U.S.-born individuals are a suspect class but nonetheless dismiss the equal protection claims because the Voting Act does not facially discriminate against citizens or U.S.-born individuals and was not enacted with a purpose to discriminate against those classes. *See Skrmetti*, 145 S. Ct. at 1832–33 (rejecting an equal protection claim by reasoning that, even if transgender individuals were a suspect class, the challenged law did not classify based on transgender status). Recognizing a suspect class is a heavy decision with serious consequences. *Id.* at 1852–53 (Barrett, J., concurring). And, here, the other grounds for dismissal are straightforward.

2013) (deeming military policies facially neutral as to religion when none "on its face prefers any religious denomination"). To illustrate, a statute that provides "one rule for mothers" and "another for fathers" facially "differentiate[s] on the basis of gender." *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). But a statute that "does not neatly divide the sexes" is "gender-neutral on its face." *Jackson v. Thornburgh*, 907 F.2d 194, 197 (D.C. Cir. 1990); *see id.* (upholding parole statute that "does not employ the concept of gender"). And a law will be deemed facially neutral when its classifications turn on something other than the forbidden trait. *See Rothe*, 836 F.3d at 61 (holding that "social disadvantage" was a "facially race-neutral" criterion for awarding contracts); *Skrmetti*, 145 S. Ct. at 1829, 1832–33 (holding that a law prohibiting gender-affirming medical treatments for minors classified based on age and "basis of medical use," not sex or transgender status).

The Voting Act simply says that a "qualified voter" must be, among other things, "a citizen of the United States; except, that this subparagraph shall not apply in a local election." D.C. Code § 1-1001.02(2). This provision, while retaining a citizenship requirement for federal elections, does not single out citizens for disfavored treatment or afford non-citizens preferential treatment in local elections. And it says nothing about national origin. The Act did not change citizens' or U.S.-born individuals' voting rights at all. Rather, as the Amended Complaint alleges, the Act "*eliminates* the prior citizenship requirement for voting in municipal elections." Am. Compl. ¶ 3 (emphasis added). In doing so, the Act "remove[d]" a classification from the D.C. Code. *Hall*, 2024 WL 1212953, at *1; *Hall*, 141 F.4th at 203. It did not impose a classification or facially discriminate against anyone; and thus, rational basis review applies.

Nonetheless, Plaintiffs allege that the Voting Act discriminates "on its face" by "dilut[ing]" the votes of citizens and U.S.-born individuals. Am. Compl. ¶ 50. But purported

vote dilution is an alleged *effect* of the Act, not a classification apparent on the Act's face. A statute is still facially neutral even if it has a foreseeably disparate impact on a suspect class. *Rothe*, 836 F.3d at 72; *see Kirkhuff v. Nimmo*, 683 F.2d 544, 553 (D.C. Cir. 1982) (recognizing that a law does not discriminate "on its face" by impacting only certain people). A facially vote-dilutive statute would be one that, by its terms, assigns different weight to different votes in the same election or that gives certain individuals a greater number of votes than others. *See Day v. Robinwood W. Cmty. Improvement Dist.*, 693 F. Supp. 2d 996, 1000–07 (E.D. Mo. 2010) (invalidating provision giving certain voters multiple votes, while upholding provision allowing non-citizen, non-resident property owners to vote in certain local elections). But when, as here, the text of a statute treats all votes in an election equally and does not differentiate among voters, the law is neutral and non-dilutive on its face because the "crux of a vote dilution claim is *inequality* of voting power—not diminishment of voting power *per se*." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1087–88 (9th Cir. 2024); *see id.* (rejecting vote-dilution challenge to "generally applicable" and "even handed" vote-by-mail system).

For those reasons, "[w]hen a claim of vote dilution is based on an expansion of the electorate, lower federal courts have overwhelmingly applied rational basis review." *Lacy*, 312 Cal. Rptr. 3d at 411; *see also, e.g.*, *May*, 132 F.3d at 580–84; *Duncan*, 69 F.3d at 94–95; *Collins v. Town of Goshen*, 635 F.2d 954, 957–59 (2d Cir. 1980) (Friendly, J.); *see Spahos v. Town of Savannah Beach*, 371 U.S. 206 (1962) (per curiam) (summarily affirming three-judge decision upholding, under rational basis review, a law allowing non-resident property owners to vote in municipal elections). Courts have explained that "*any* time voters are added to the rolls," "those already on the rolls have had their votes diluted" in a colloquial sense, and yet "mere expansion of the class of persons eligible to vote does not, *per se*, imply *unconstitutional* vote dilution."

*Duncan*, 69 F.3d at 94 & n.3 (emphases added).  A contrary rule "would make any expansion of the voting rolls subject to attack" and impermissibly "leave the scope of the franchise static and virtually unchangeable."  *Id.* at 95.  Further, vote dilution cases "do not concern electoral schemes that deny the franchise to citizens who are otherwise qualified" because the "laws expand rather than restrict the franchise, and overinclusiveness is a lesser constitutional evil than underinclusiveness."  *Lacy*, 312 Cal. Rptr. at 411–12 (citation modified); *see also Sutton v. Escambia Cnty. Bd. of Educ.*, 809 F.2d 770, 775 (11th Cir. 1987).

Several decisions are instructive.  In *Duncan*, the Sixth Circuit rejected voters' claim that a reapportionment law unconstitutionally "diluted" their votes by allowing non-residents to vote in schoolboard elections.  69 F.3d at 90–92.  The court explained that "vote dilution is a term of art" and that "[m]erely expanding the voter rolls is, standing alone, insufficient to make out a claim of vote dilution."  *Id.* at 94.  Rather, "the inclusion of voters *unconstitutionally* dilutes" voting power only when it is "*irrational*," which is not the case when new "voters have a substantial interest in the [relevant] election."  *Id.* at 94–95 (emphases added).  The Sixth Circuit thus upheld the franchise expansion there in significant part because the non-resident voters provided funds to their neighboring school districts through sales and property taxes.  *Id.* at 96–98.

In *May*, the Tenth Circuit rejected equal protection challenges to a town charter allowing non-residents to vote in local elections if, among other things, they owned at least 50% of a piece of land in the town.  132 F.3d at 577–78.  Declining to apply strict scrutiny, the court noted that the town charter "does not restrict the right to vote—it expands it to include nonresidents owning real property."  *Id.* at 580 & n.6.  This was "[o]f critical importance," the court explained, because "the rational basis test" governs "vote dilution" claims "where a law expands the right to

vote." *Id.* at 580–83 & n.8 (citation modified). Accordingly, the town charter in *May* passed constitutional muster because the non-residents owned property in the town, paid property taxes, and were subject to town laws. *Id.* at 582–83.[8]

Plaintiffs here have not even alleged that the Voting Act is irrational, much less that non-citizen residents lack a substantial interest in District elections. To the contrary, as the Council concluded, non-citizen residents pay District taxes, raise their families in the District, send their children to District schools, own property in the District, and abide by and are subject to the laws of the District. Comm. Rep. at 3–4, 7–8. Those are substantial interests by any measure. *See, e.g.*, *May*, 132 F.3d at 582–83 (deeming it "rational" to expand "the political process" to include those who paid local taxes and were subject to local laws).

Contrary to Plaintiffs' assertions, nothing in one Tennessee district court's decades-old decision in *Brown v. Board of Commissioners*, 722 F. Supp. 380 (E.D. Tenn. 1989), supports their claim. *See* Am. Compl. ¶ 46. In *Brown*, after decades of intentional discrimination against and disenfranchisement of minority residents, a city sought to dilute minority residents' votes by amending its charter to allow non-resident property owners to vote in local elections, regardless of their percentage of ownership. 722 F. Supp. at 382–88, 397–99. The district court agreed that

---

[8]     Similar decisions abound. *E.g.*, *Davis v. Linville*, 864 F.2d 127, 129–30 (11th Cir. 1989) (upholding law allowing non-residents to vote in schoolboard elections); *Cantwell v. Hudnut*, 566 F.2d 30, 37–38 (7th Cir. 1977) (holding that alleged "dilution of plaintiffs' votes" by allowing non-residents to vote for police and fire protection was not "violative of equal protection"); *Bennett*, 140 F.3d at 1225–27 (holding that counting "blank ballots" caused "no disenfranchisement or meaningful vote dilution" as "[e]very ballot submitted was counted, and no one was deterred from going to the polls"); *Angel v. City of Fairfield*, 793 F.2d 737, 739–40 & n.3 (5th Cir. 1986) (finding no "vote dilution" from allowing "nonresidents to vote" when "all of the qualified voters were treated alike"); *Partido Nuevo Progresista*, 639 F.2d at 827–28 (holding that mismarked ballots had not "diluted" validly cast votes); *Powell v. Power*, 436 F.2d 84, 86–88 (2d Cir. 1970) (rejecting equal protection claim that "illegal voting" caused "dilution" of plaintiffs' votes in primary election).

expansions of the franchise receive only rational basis review.  *Id.* at 398.  Still, the court struck

down the amendment as "irrational" and noted that the charter had "no limitation on the number

of people who can 'vote' on a piece of property" and "no limitation as to any minimum property

value required for the exercise of the franchise."  *Id.* at 399.  As a result, dozens of non-residents

with only a fractional interest in a small, cheap plot of land could determine the outcome of

citywide elections, which "does not further any rational government interest."  *Id.* at 399 & n.24.

No such irrationality exists here.  The Voting Act extends the franchise only to qualified

non-citizen *residents—i.e.*, those whose "principal or primary home" is "fixed" in the District,

D.C. Code § 1-1001.02(16)—all of whom the Council reasonably found have a substantial

interest in District matters.  Nor does the Act allow for the fragmentation of votes based on

trivial interests, as each qualified citizen and each qualified non-citizen continues to have only

one vote per person in local elections.  *See Wise v. Circosta*, 978 F.3d 93, 100 n.8 (4th Cir. 2020)

(en banc) (observing that "no vote is diluted" when each "qualified person gets one vote and

each vote is counted equally" (citation modified)).  In any event, the expansion of the electorate

in this case was not a thinly veiled effort to perpetuate decades of intentional discrimination

against any historically disenfranchised group.  *Cf. Brown*, 722 F. Supp. at 382–88.

**B.    Plaintiffs Have Not Plausibly Alleged Facts Showing That the Voting Act Has a Discriminatory Purpose.**

Nor can Plaintiffs plausibly allege that the Act has a discriminatory purpose.  When

challenging a facially neutral law under equal protection principles, plaintiffs must show that the

law is discriminatory in both its effect and purpose.  *United States v. Holton*, 116 F.3d 1536,

1548 (D.C. Cir. 1997) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  The intent to

discriminate must reflect more than mere "awareness of consequences" or "foreseeability."

*Rothe*, 836 F.3d at 72 (citation modified).  Plaintiffs must instead show that the challenged law

was enacted "because of, not merely in spite of, its adverse effects upon an identifiable group"—a showing that cannot be made when a law "can be readily and logically explained on grounds other than discriminatory purpose." *United States v. Johnson*, 40 F.3d 436, 439–41 (D.C. Cir. 1994) (citation modified); *see id.* (upholding "disparate penalties" for crack-cocaine and powder-cocaine offenses despite statistical evidence of racially disparate impact).

The same principles govern vote dilution claims brought under the Constitution. *Alexander v. S.C. State Conf. of the NAACP*, 601 U.S. 1, 38–39 (2024). As the Supreme Court has explained, equal protection "prohibits *intentional* 'vote dilution.'" *Abbott v. Perez*, 585 U.S. 579, 586 (2018) (emphasis added) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 66–67 (1980) (plurality)). It does not prohibit all facially neutral laws that happen to have a dilutive effect on some individuals' voting power. *See Bolden*, 446 U.S. at 67 (plurality) (rejecting notion that "disproportionate effects alone may establish a claim of unconstitutional racial voter dilution"); *id.* at 71 n.17 (explaining that legislatures are not "presumed to have 'intended'" vote dilution "simply because that was a foreseeable consequence"). Plaintiffs asserting vote dilution therefore cannot simply allege that a law has the effect of diluting their votes; rather, they must plausibly allege facts showing that the *purpose* of the law was to dilute their votes. *See Alexander*, 601 U.S. at 38–39 (recognizing that plaintiffs "pressing a [constitutional] vote-dilution claim" must show that the challenged law "has the purpose *and* effect of diluting the minority vote" (citation modified)); *Rogers v. Lodge*, 458 U.S. 613, 617–18 (1982) (requiring vote dilution plaintiffs to show that the challenged laws were "conceived or operated as purposeful devices to further [invidious] discrimination" (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971))).

30

Here, Plaintiffs have alleged zero facts establishing that the Voting Act was enacted for the purpose of discriminating against, or diluting the votes of, a constitutionally protected class. As this Court observed, the Complaint is "thin on facts." *Hall*, 2024 WL 1212953, at *4. Nothing in the Amended Complaint or the legislative history suggests that the purpose of the Act was to dilute citizens' votes or otherwise disadvantage citizens. Indeed, it strains reason to infer that the District's popularly elected legislative body intended to harm the vast majority of the District's population, citizens and U.S.-born individuals. *See* Comm. Rep. at 3 (estimating that 15% of the District's population are immigrants). Instead, the Council's purpose was to "expand[ ] voting rights and improve[ ] access to democracy for all District residents," *id.* at 2— a goal of equal treatment for all qualified Washingtonians, which is the opposite of an equal protection violation.

Instead of providing plausible allegations of discriminatory intent, Plaintiffs assert that "no inquiry into legislative purpose is needed," Am. Compl. ¶ 51, and that the Act allegedly dilutes the votes only of U.S. citizens and "native-born U.S. citizens," *id.* ¶¶ 60, 64. According to Plaintiffs, the Act's "primary motive" was to "aid" foreign-born District residents by allowing some of them to vote in local elections, and this "intentional expansion" of the local electorate "automatically decreases the voting power" of District residents "who were born in the United States." *Id.* ¶ 33. But allegations of vote dilution are not sufficient to state a claim without allegations that the District intentionally diluted Plaintiffs' votes. *See Alexander*, 601 U.S. at 38– 39. Plaintiffs' allegations at most suggest that dilution was a potentially foreseeable consequence—not that the Act was enacted *because of* that alleged consequence. *See Bolden*, 446 U.S. at 71 n.17 (plurality) (declining to presume intentional vote dilution "simply because" it was "foreseeable"). Intentionally expanding the electorate does not mean a legislature acted with

the specific intent to unconstitutionally dilute the votes of those already on the rolls. *See, e.g.*, *May*, 132 F.3d at 580–83; *Duncan*, 69 F.3d at 94–95. Aiding immigrants is not the same as discriminating against non-immigrants. Altogether, considering the clear legislative history and "spare facts and allegations" in the Amended Complaint, the Court cannot reasonably infer that the Council was "motivated by discriminatory intent or purpose," so the equal protection claims should be dismissed for this reason too. *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009).

### C.    U.S. Citizens and U.S.-Born Individuals Are Not Suspect Classes.

Even if the Court were to find that the Voting Act facially discriminates against citizens or U.S.-born individuals or has a discriminatory purpose, Plaintiffs' claims nonetheless fail because neither citizens nor U.S.-born individuals are a suspect class. In this case, Plaintiffs have not cited any binding authority recognizing citizens or U.S.-born individuals as suspect classes under the Equal Protection Clause, and the District is aware of none. This Court would thus need to recognize two new suspect classes, yet the Supreme Court has not recognized new suspect classes for decades. *Skrmetti*, 145 S. Ct. at 1851 (Barrett, J., concurring).

The "hallmarks" of a protected class are "a history of discrimination, immutable characteristics, and political disenfranchisement." *Hedgepeth*, 386 F.3d at 1154. Moreover, a protected class is a group that has "historically been relegated to such a position of political powerlessness" that it needs "extraordinary protection from the majoritarian political process." *United States v. Cohen*, 733 F.2d 128, 135 (D.C. Cir. 1984) (en banc) (Scalia, J.) (citation modified). U.S. citizens cannot plausibly be described in those terms, and neither can native-born Americans generally since they always or almost always qualify as citizens. *See Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 354–55 (1st Cir. 2004) (suggesting it would be "absurd" to treat citizens as "a suspect class"). As Plaintiffs themselves

32

admit, it would be a "rare event" for "[c]itizens and the American-born" to be "burdened based on these characteristics." Pls.' 1st Opp'n at 13. That admission just confirms that U.S. citizens and U.S.-born individuals are not the sort of historically subjugated groups that deserve "the 'suspect class' designation." *Cohen*, 733 F.2d at 135. Accordingly, courts have rejected the argument that citizens are a suspect class. *E.g.*, *Lacy*, 312 Cal. Rptr. 3d at 412–13; *cf. Mathews v. Diaz*, 426 U.S. 67, 78 & n.12 (1976) (indicating that laws may, consistent with equal protection, validly "treat certain aliens more favorably than citizens"). This Court should too.

## IV.  The "Right to Citizen Self-Government" Claim Fails.

Finally, Plaintiffs bring a standalone claim alleging that the Voting Act violates their "constitutional right to citizen self-government." Am. Compl. ¶ 66–69. No such right exists, especially one that is judicially enforceable. Constitutional rights generally come in two forms. First are those enumerated in the Constitution, namely in its amendments. *See Dobbs*, 597 U.S. at 235. There is no "right to citizen self-government" in the text of the Constitution, and no court has ever recognized a claim to enforce such a right. Second, the Supreme Court has recognized unenumerated rights through the doctrine of substantive due process. *Id.* at 237, 239–40; Argument § II, *supra*. Indeed, Plaintiffs have asked the Court to recognize their "right to citizen self-government" in this way. Pls.' 1st Opp'n at 18–19. But, as explained above, Plaintiffs fail to allege a fundamental right, whether framed as a "right to citizen self-government" or something else. Argument § II.A–B, *supra*. Accordingly, there is no avenue to recognize Plaintiffs' standalone claim seeking to vindicate a made-up "right to citizen self-government," so such a claim fails. *See In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 71–74 (D.C. Cir. 2019) (per curiam) (rejecting "a freestanding constitutional right to informational privacy" that was "untethered to specific constitutional provisions").

## CONCLUSION

For these reasons, the Court should dismiss the Amended Complaint for failure to state a

claim.

Date: December 10, 2025                          Respectfully submitted,

                                                 BRIAN L. SCHWALB
                                                 Attorney General for the District of Columbia

                                                 CHAD COPELAND
                                                 Deputy Attorney General
                                                 Civil Litigation Division

                                                 */s/ Matthew R. Blecher*
                                                 MATTHEW R. BLECHER [1012957]
                                                 Chief, Civil Litigation Division, Equity Section

                                                 */s/ Honey Morton*
                                                 HONEY MORTON [1019878]
                                                 Assistant Chief, Equity Section

                                                 */s/ Adam J. Tuetken*
                                                 ADAM J. TUETKEN [242215]
                                                 Assistant Attorney General
                                                 Civil Litigation Division
                                                 400 6th Street, NW
                                                 Washington, D.C. 20001
                                                 Phone: (202) 735-7474
                                                 Email: adam.tuetken@dc.gov

                                                 *Counsel for Defendant*

34