# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RALPH CHITTAMS, *et al.,*

      *Plaintiff*s,

        v.

DISTRICT OF COLUMBIA
BOARD OF ELECTIONS,

      *Defendant.*

No. 1:23-cv-01261-ABJ

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ........................................................................................... 1

ARGUMENT ............................................................................................................................ 3

    I.    Plaintiffs' Equal Protection Claims are Meritorious ................................................. 4

    II.   Plaintiffs' Citizen Self-Government Claim is Meritorious ............................. 13

    III.  Plaintiffs' Due Process Claim is Meritorious .................................................. 21

CONCLUSION .......................................................................................................................... 23

## SUMMARY OF ARGUMENT

Plaintiffs bring four claims in this action: two claims under the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the first alleging that the District of Columbia's Noncitizen Voting Law (NCVL) discriminates unlawfully against Plaintiffs based on citizenship, and the second alleging that the NCVL discriminates unlawfully against Plaintiffs based on national origin; a claim that the NCVL contravenes Plaintiffs' constitutional right to citizen self-government, considered as a right implied by the Constitution apart from the Due Process Clause; and a claim that the NCVL also violates Plaintiffs' Fifth Amendment right to due process by contravening this same, fundamental right of the people to govern themselves.

All of these claims, the arguments of Defendant (the District) notwithstanding, are meritorious. By express reference, the NCVL classifies voters in DC local elections by citizenship. Also, by necessary implication from its terms alone, the NCVL dilutes the votes of citizens, while, by inevitable operation, it dilutes the votes of persons of American national origin. For these reasons, the NCVL, on its face, dilutes the votes of classes of voters based on both citizenship and national origin. Facial vote dilution on these suspect bases should be given strict scrutiny and may be sustained only if narrowly tailored to serve a compelling governmental interest. The District has identified no compelling governmental interest in granting the right to vote to noncitizens—including illegal aliens and diplomats—in DC local elections. Indeed, the District cannot assert even a cognizable interest in giving alien residents of DC, including diplomats and illegal aliens, a vote in local government elections. Expanding the electorate to include noncitizens entails redefining DC's political community in a way contrary to the way the political community of the United States, according to precedent of both the Supreme Court and

this Circuit, is defined in the Constitution. For example, illegal aliens are clearly outside of the political community under this Circuit's precedent. Thus, DC can have no cognizable interest in a measure that gives them membership in this community, and accordingly has no rational basis for that measure.

Plaintiffs' claim based on their right to citizen self-government is also meritorious. As recognized by the Supreme Court in numerous cases, this right springs from the basic theory of representative democracies, which the Constitution (as a blueprint for a democratic republic) presupposes. The Court relied on its statements of this right to reach its judgments in these cases, and those statements are thus holdings of the Court—and, as such, binding precedent. Contrary to the District's claim that the only unenumerated rights secured in the Constitution are those protected by implication in the Due Process Clause, the Ninth Amendment recognizes that rights may be implied by the Constitution in other ways. Here, the right to citizen self-government is not only presupposed by the Constitution (flowing, as the Supreme Court recognized, from the basic theory of representative democracy), but it also follows from the ultimate sovereignty of the American people—that is, U.S. citizens—which is unmistakably evidenced, for example, by the Preamble to the Constitution in combination with the Supremacy Clause.

Indeed, the right to citizen self-government does not merely follow from popular sovereignty. It is in fact nothing more than a restatement and equivalent of popular sovereignty. If the American people do not have the right to govern themselves, they are not sovereign over this country; if they do have the right to govern themselves, they are so sovereign. Presumably, not even the District would deny the sovereignty of the American people over this country; the sovereignty of the American people has been universally and continuously recognized as a bedrock principle of American government and constitutionalism from 1776 to the present day.

Historically and today, no principle of governance could be more universally acknowledged as an essential part of our constitutional structure. The District then cannot be right when it claims that the right to citizen self-government, which is equivalent to this sovereignty, does not exist. And if the right to citizen self-government exists, it is clearly infringed by the NCVL.

Regarding Plaintiffs' due process claim, the District would have this Court insist on the narrowest possible description of the asserted fundamental right—here, the right to vote in elections in which only citizens vote. That right, it argues, citing examples, is not deeply rooted in history and practice. But there is nothing against the careful-description requirement in Plaintiffs' assertion that there is a fundamental right to citizen self-government protected by the Due Process Clause. This right has direct reference to the facts of this case, since the NCVL directly infringes it. And, since it is equivalent to popular sovereignty itself, it is no mere dubious generality (such as "the right to die"). To the contrary, the District's examples notwithstanding, popular sovereignty is deeply rooted in our nation's history and tradition to a superlative, probably unique, degree. Needless to say, the District can assert no compelling or even cognizable governmental interest in infringing or undermining the sovereignty of the people.

## ARGUMENT

In evaluating motions to dismiss for failure to state a claim, courts assume the truth of plaintiffs' factual allegations, granting them all reasonable inferences from such allegations, and determine whether plaintiffs have stated plausible claims for relief. *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018). Here, Plaintiffs' claims are more than plausible.

Even though the D.C. Circuit found, without examining any facts but the text of the NCVL, that it injures all citizen voters in DC by diluting their votes, the District persists in claiming that the NCVL dilutes the votes of citizens and those of American origin neither on its

face nor intentionally. ECF Doc. No. 34 (Def's Memo) at 25-32. It falsely claims that U.S. citizens are not a protected class, though noncitizens are, *id.* at 32-33, and that those of American national origin, unlike those of foreign national origin, are also not a protected class, *id.* Disregarding Supreme Court precedent, it denies the existence of the right to citizen self-government, claiming that there is no avenue by which it is implied by the Constitution, and that it is negated by a history of its violation. *Id.* at 19, 24 n.6, 33. Also, by defining the fundamental right plaintiffs claim is protected by the Due Process Clause with unnecessary narrowness, *id.* at 8-9, and citing examples when this right has been violated, the District fails to refute the claim that the right to citizen-self-government itself is so protected.

## I.    Plaintiffs' Equal Protection Claims are Meritorious

The NCVL gives noncitizens living in D.C. what they never had—the right to vote. And it takes away from D.C. citizens what they have always had—the exclusive right to vote. Put another way, the NCVL's grant of the benefit of voting to noncitizens burdens citizens by weakening the power of their votes. This differing treatment of two groups classified by the NCVL meets the threshold requirement for an equal protection challenge. "Analysis of an equal protection claim alleging an improper statutory classification involves two steps. Appellants must first show that the statute, either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group." *United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995) (citing *Jones v. Helms*, 452 U.S. 412, 423-24 (1981) and *Hernandez v. Texas*, 347 U.S. 475, 479 (1954)). Thus, claims of vote dilution have consistently been analyzed under the Equal Protection Clause. *See Reynolds v. Sims*, 377 U.S. 533 (1964) (enunciating the legal principle of one-person, one-vote); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (concerning partisan gerrymandering). Of

course, the NCVL also treats citizens and noncitizens "the same" by letting both groups vote. But it is hardly impossible for the same government policy to treat two groups equally and also unequally. Allowing nonresident property owners to vote in a city puts them on a par with city residents, but by doing so benefits the former and weakens the voting power of the latter. *See, e.g., Brown v. Bd. of Comm'rs*, 722 F. Supp. 380, 398 (E.D. Tenn. 1989) (striking down an expansion of the franchise to nonresidents of a city under the Equal Protection Clause). Closing the voter registration office in a Louisiana parish to both whites and blacks treated white and black applicants to vote the same, but also differently where the majority of voting-age whites in the parish were already registered and the majority of voting-age blacks were not. *United States v. Palmer*, 356 F.2d 951, 952 (5th Cir. 1966).

The District appears to admit to this unequal treatment when, discussing nonresident voting cases, it urges that this case, like them, should be decided under the rational basis test, which was used to decide these equal protection challenges because they did not present the conditions for strict scrutiny. Def's Memo at 21. As the Sixth Circuit put it, vote dilution factually occurs whenever the franchise is expanded, but "vote dilution" as a term of art refers to *unconstitutional* vote dilution. *Duncan v. Coffee County*, 69 F.3d 88, 94 & n.3 (6th Cir. 1995). The court went on to find that the vote dilution in that case, which did not dilute the votes of protected classes, merited only rational-basis scrutiny, which it passed. *Id.* at 96-98. Here, the D.C. Circuit held that, at least factually, the votes of all citizen voters in DC were diluted by the NCVL, and thereby these voters were injured for standing purposes. *Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 207 (D.C. Cir. 2025). Plaintiffs claim that this vote dilution merits strict scrutiny, because the groups whose votes are diluted—citizen voters and voters of American national origin—are both protected classes. Another reason the NCVL merits strict scrutiny

under the Equal Protection Clause is that it does burden a fundamental right—the right to citizen

self-government. "[E]qual protection analysis requires strict scrutiny of a legislative

classification only when the classification impermissibly interferes with the exercise of a

fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret.*

*v. Murgia*, 427 U.S. 307, 312 (1976) (footnote omitted). *See infra*, sections II and III (showing

that the right to citizen self-government, being equivalent to the sovereignty of the people, is

fundamental, and that it is infringed by the NCVL).

 Nevertheless, the District claims that the NCVL does not dilute the votes of these groups

either on its face or intentionally, and therefore, absent proof of a discriminatory purpose,

Plaintiffs' equal protection claims fail. Def's Memo at 24-32. The District's claim seems hard to

maintain in the face of the D.C. Circuit's determination, which it made after considering no

additional facts, but only the text of the NCVL, that the NCVL injures all citizen voters in DC by

diluting their votes. *Hall*, 141 F.4th at 207. In any event, by stating in a subparagraph that

citizenship is a requirement for voting, and then stating that this subparagraph  shall not apply to

local elections, the text of the NCVL expressly makes a citizenship classification, thereby

classifying persons based on citizenship on its face. D.C. Code § 1-1001.02(2).

 The NCVL also necessarily implies, by its terms alone, that the votes of citizens will be

diluted. As the Supreme Court has explained:

> [The plaintiff]'s position, and to some extent that of the court below, rest upon a
> misunderstanding  of *Grosjean* v. *American Press Co*., 297 U.S. 233 (1936),
> and *Gomillion* v. *Lightfoot*, 364 U.S. 339 (1960). These cases stand, not for the
> proposition that legislative motive is a proper basis for declaring a statute
> unconstitutional, but that the *inevitable effect of a statute on its face* may render it
> unconstitutional. Thus, in *Grosjean* the Court, having concluded that the right of
> publications to be free from certain kinds of taxes was a freedom of the press
> protected by the First Amendment, struck down a statute which on its face did
> nothing other than impose just such a tax. Similarly, in *Gomillion*, the Court
> sustained a complaint which, if true, established that the "inevitable effect," 364

> U.S., at 341, of the redrawing of municipal boundaries was to deprive the petitioners of their right to vote for no reason other than that they were Negro. In these cases, the purpose of the legislation was irrelevant, because the inevitable effect—the "necessary scope and operation," *McCray* v. *United States*, 195 U.S. 27, 59 (1904)—abridged constitutional rights.

*United States v. O'Brien*, 391 U.S. 367, 384-385 (1968). Under both *O'Brien* and *Gomillion*, the purpose of the NCVL is irrelevant, because its inevitable effect is to dilute the votes of citizens.

Another inevitable effect of the NCVL is to expand the number of foreign-born persons who may vote, thus benefitting this group (which includes both citizens and noncitizens) and, consequently, harming the native-born by diluting their votes. In a word, the NCVL shrinks the political influence of voters of American national origin in Washington, D.C. It does so inevitably, since, of course, all of the noncitizens allowed to vote by the NCVL are foreign-born.

Citizenship is a suspect classification, with the single exception, not operative here, of when aliens are barred from voting or governing. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 105 (1973) ("The highly suspect character of classifications based on race, nationality, or alienage is well established.") (Brennan, J., dissenting); *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) ("Alienage classifications by a State that do not withstand this stringent examination cannot stand."); *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 372 (S.D.N.Y. 2014) ("[T]he Court has repeatedly applied strict scrutiny to statutes discriminating on the basis of alienage.").

National-origin classifications also are suspect. And persons of American birth or ancestry, like those of birth or ancestry in any other country, are a national origin group, and thus a protected class. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) ("The term 'national

origin' on its face refers to the country where a person was born, or more broadly, the country from which his or her ancestors came."); *Hernandez v. Texas*, 347 U.S. 475, 479 (1954) ("The exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment."); *Tippie v. Spacelabs Medical, Inc.*, 180 Fed. App'x 51, 55 (11th Cir. 2006) (finding a prima facie case of national origin discrimination where American citizen plaintiff was denied employment in favor of a non-American citizen); *Chaiffetz v. Robertson Research Holding Ltd.*, 798 F.2d 731, 733 (5th Cir. 1986) ("We agree that employment discrimination based only on one's country of birth, whether that birthplace is the United States or elsewhere, contradicts the purpose and intent of Title VII."); *Malina v. Makitso United States LLC*, No. 4:19-01808, 2019 U.S. Dist. LEXIS 213113, at *7-8 (S.D. Tex. Oct. 18, 2019) (permitting plaintiff to "assert Title VII discrimination and harassment claims based on her 'American' national origin."); *Thomas v. Rohner-Gehrig & Co.*, 582 F. Supp. 669, 675 (N.D. Ill.1984) (holding that an employment discrimination claim based on American national origin was legally cognizable).

The District nevertheless denies that either citizens or those of American national origin are a protected class, on the ground that these groups are too "powerful" to need such protection. Def's Memo at 32-33. But the District's vision of classes of hereditary victims and hereditary oppressors, in which "powerful" groups, such as American citizens, native-born Americans, and white people, can never be protected classes, has been roundly rejected by the Supreme Court. As the Court has explained:

> Eliminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies "without regard to any differences of race, of color, or of nationality"—it is "universal in [its] application." *Yick Wo* [*v. Hopkins*], 118 U.S. [356], 369, 6 S. Ct. 1064, 30 L. Ed. 220 [(1886)]. For "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another

color." *Regents of Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 289-290, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978) (opinion of Powell, J.). "If both are not accorded the same protection, then it is not equal." *Id.*, at 290, 98 S. Ct. 2733, 57 L. Ed. 2d 750.

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206

(2023). *See id.* at 208 ("'Distinctions between citizens solely because of their ancestry are by

their very nature odious to a free people whose institutions are founded upon the doctrine of

equality.' *Rice* v. *Cayetano*, 528 U.S. 495, 517, 120 S. Ct. 1044, 145 L. Ed. 2d 1007 (2000)

(quoting *Hirabayashi* v. *United States*, 320 U.S. 81, 100, 63 S. Ct. 1375, 87 L. Ed. 1774

(1943)).". As directly applicable to whether U.S. citizens and persons of American national

origin can be protected classes, the Supreme Court has held there to be a

> basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons,* not *groups.* It follows from that principle that all governmental action based on race—a *group* classification long recognized as "in most circumstances irrelevant and therefore prohibited," *Hirabayashi,* 320 U.S. at 100— should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed.

*Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995) (emphasis in original).

It follows from this longstanding approach that the principles of equal protection disallow

discrimination based on general suspect *characteristics*, such as race, national origin, and

citizenship status, leaving the circumstances of a case to decide which particular group defined

by those characteristics needs protection. After all, if a previously- or generally-powerful group

is harmed by a particular law or governmental practice, it is no longer "powerful" in the

circumstances before the court. Thus, though the University of Michigan was governed and

operated mainly by white people, its disfavoring of white applicants for admission was subjected

to (and failed) strict scrutiny. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). So, too, here. For

whatever reason, U.S. citizens and native-born Americans, as classes, were not all-powerful in

DC when the NCVL was passed, and in the circumstances of this case, Plaintiffs, as members of

those classes, have not come before this Court from a place of power and privilege needing no real defense from the Constitution.

The NCVL also dilutes the votes of the American-born intentionally, because its purpose, as the District admits, was to benefit "immigrants." Amended Complaint at ¶ 33; Def's Memo at 22, 32. However benign this purpose, it still necessarily harms those who are not immigrants—that is, those of American national origin—because, by expanding the voting power of immigrants, it necessarily shrinks the voting power of the American-born. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion) ("[A]bsent searching judicial inquiry . . . . there is simply no way of determining what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics."). Voting, like university admissions, is a zero-sum game. For example, the racial preferences the Supreme Court invalidated in *Students for Fair Admissions* were meant to help the Harvard community and underrepresented minorities, 600 U.S. at 215-16, but the Court still applied strict scrutiny with no inquiry into any "specific intent"—such as the District demands be shown here, Def's Memo at 31-32—to harm other racial groups.

As stated above, the NCVL also merits strict scrutiny under the Equal Protection Clause because it burdens a fundamental right—the right to citizen self-government. The fundamental nature of the right to citizen self-government, and that it is clearly burdened by the NCVL, is shown *infra*, in sections II and III.

Laws, such as the NCVL, that on their face treat people differently based on a protected characteristic, or have the inevitable effect of doing so, or do so intentionally, or burden a fundamental right, receive strict scrutiny. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 632, 643 (1993) ("No inquiry into legislative purpose is necessary when the racial classification appears on the

face of the statute."); *Gomillion* v. *Lightfoot*, 364 U.S. 339, 341 (1960) (finding racial discrimination with no inquiry into legislative purpose when the "inevitable effect" of redrawing municipal boundaries was to deny blacks the right to vote): *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (explaining that facial classifications based on race, alienage, and national origin "are so seldom relevant to the achievement of any legitimate state interest," that they "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.") (superseded by statute on other grounds) (internal citations omitted).

The NCVL cannot pass strict scrutiny, or even rational basis scrutiny. The District has identified no compelling governmental interest in granting the right to vote to noncitizens—including illegal aliens and diplomats—in DC local elections. Indeed, whatever interest DC asserts it has for doing so—and, indeed, it asserts an interest in expanding its political community, Def's Memo at 22—cannot be compelling, or even cognizable. Pursuing that interest entails redefining DC's political community in a way contrary to the way the political community of the United States, according to precedent of both the Supreme Court and this circuit, is defined in the Constitution. For example, illegal aliens are clearly outside of the political community, as defined in the Constitution, under this Circuit's precedent. *Bluman v. FEC*, 800 F. Supp. 2d 281, 288, 292 (D.D.C. 2011) (three-judge panel defining the political community as including at most citizens and lawful permanent residents), *summarily aff'd*, 565 U.S. 1104 (2012). Thus, DC can have no cognizable interest in giving illegal aliens membership in this community, and accordingly has no rational basis for doing so. Thus, for the same reasons, DC lacks a cognizable governmental interest in redefining its political community to include noncitizens of any immigration status. *Cabell v. Chavez-Salido*, 454 U.S. 432, 439-440

11

(1982) ("Noncitizens are by definition outside of [the political] community."); *Maxwell v. Dow*, 176 U.S. 581, 608 (1900) ("[T]he political community known as the People of the United States ordained and established the Constitution of the United States; and every member of that political community was a citizen of the United States") (Harlan, J., dissenting).

Put another way, the NCVL lacks a rational basis because it involves a contradiction. Since DC is part of the United States, its political community cannot be broader than that of the United States; asserting otherwise is to affirm a contradiction—that the political community of the United States is broader than itself—and is therefore irrational. Nor does the local character of the NCVL obviate this contradiction, as if there might be many different political communities, consisting of the federal one and state or local variations. According to the Supreme Court, U.S. citizenship is a perquisite for membership in state or local U.S. political communities, too, and the political community of the nation (apart from geographical residence) defines the political community of states or localities. *See, e.g., Cabel*, 454 U.S. at 439-440 (involving a California law applied by Los Angeles; "[n]oncitizens are by definition outside of [the political] community.").

Also, this Circuit, relying on Supreme Court cases, recognizes a "compelling interest" in "preventing foreign influence over" American self-government. *Bluman*, 800 F. Supp. 2d at 290. Weighed against this compelling interest, no interest in giving foreign nationals not just influence, but the right to vote in local elections that affect them, can stand, even if it were otherwise rational.[1] The governmental interest in keeping American self-government free from

---

[1] Nor, for the same reasons, can the District assert a cognizable interest necessary to pass the *Anderson-Burdick* test applicable to voting changes not based on protected characteristics. *See, e.g., Richardson v. Trump*, 496 F. Supp. 3d 165, 181 (D.D.C. 2020).

the influence of foreigners is hardly compelling if there is simultaneously a legitimate governmental interest in letting foreigners vote.

## II.    Plaintiffs' Citizen Self-Government Claim is Meritorious

As recognized by the Supreme Court in numerous cases, the right to citizen self-government springs from the basic theory of representative democracies, which the Constitution (as a blueprint for a democratic republic) presupposes.

When faced with claims that municipal laws barring aliens from governmental functions—such as being police officers or public schoolteachers, or voting—offended the Equal Protection Clause, the Supreme Court repeatedly has held that, because there is a right to citizen self-government, barring aliens from these functions did not offend the Equal Protection Clause. *Foley v. Connelie*, 435 U.S. 291 (1978) (police officers); *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) (probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (public schoolteachers).

In recognizing the right to citizen self-government, the Court declared: "The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a *necessary consequence* of the community's process of political self-definition." *Cabell*, 454 U.S. at 439-440 (emphasis added). The Court held that American citizens (including, of course, foreign-born American citizens) comprise the body politic of the United States. "Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community." *Id. See also Foley*, 435 U.S. at 295-96 ("The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. The individual, *at that point*, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking.

Accordingly, we have recognized a State's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's *obligation* to preserve the basic conception of a political community.") (internal citation omitted) (emphases added). "[A] democratic society is *ruled by its people*. *Thus*, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions." *Id.* at 296 (emphasis added). Such restrictions "represent[] the choice, and *right, of the people to be governed by their citizen peers*." *Id.* (emphasis added). "[A]lthough we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens." *Id.* at 297. *See also Ambach*, 441 U.S. at 73-74 ("Some state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government [by naturalizing]").

The Court's recognition of this right was a necessary part of its reasoning. *See Foley*, 435 U.S. at 296 (finding that the Court's theory of citizen self-government had the "practical consequence" that restricting municipal jobs involving governing functions to citizens did not offend the Equal Protection Clause); *Ambach*, 441 U.S. at 73-74 (explaining that the Court found exclusions of aliens from governing functions did not violate equal protection because the aliens had not "become part of the process of self-government" through naturalization). Indeed, it is hard to see how any substitute principle—perhaps some narrower substitute principle—other than the principle that aliens are by definition outside of the process of self-government constitutionally reserved for citizens, could have been both true and entailed the conclusions the Court reached, even if any court other than the Supreme Court were at liberty to replace the principle the Court relied on. The Court's repeated explications of the right to citizen self-

government were holdings, binding on this Court. *See, e.g., Torres v. Madrid*, 592 U.S. 306, 329 (2021) (defining dicta, as opposed to holdings, as "passage[s] unnecessary to the outcome" of a case); Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005) (defining a holding as consisting of "those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment").

Indeed, any attempt to limit the Court's holdings to their conclusions that jurisdictions may exclude aliens from government is to rob these conclusions of any stated justification. If the Court, when it recognized the right to citizen self-government, did not mean to state anything more than that jurisdictions have a right to exclude aliens from government, and from this concluded that aliens may be excluded (by jurisdictions) from government, its conclusion and its premise, though worded differently, say one and the same thing. Needless to say, such circular reasoning should not be ascribed to the Court. There is no need to enter this question-begging region of "the forbidden land of the sophists." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 671 (2012) (Scalia, J., Kennedy, J., Thomas, J., and Alito, J., dissenting). The Court enunciated broad, self-evident principles about the nature of democratic self-rule, and used them to decide the cases before it. These principles must be holdings, however unpalatable they are to the District, or fatal to the NCVL.

Nor are these statements mere "grandiloquence," as the District suggests, Def's Memo at 19 (citing *Kerry v. Din*, 576 U.S. 86, 93–95 (2015)). They are carefully chosen statements of principles—rules of law—used to decide the cases. *See* Antonin Scalia, *ESSAY: The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989) (arguing for the desirability of the Supreme Court's deciding cases using broad rules, in order to bind lower courts and itself). It is hard to see

on what grounds even the Supreme Court could deny that these deliberate and clear statements are holdings. In any event, this Court cannot brush them aside.

Contrary to the District's claim that the only unenumerated rights secured in the Constitution are those protected by implication in the Due Process Clause, Def's Memo at 33, the Ninth Amendment recognizes that rights may be implied by the Constitution in other ways. U.S. Const. Amend. 9 ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."); *see Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (deriving an unenumerated right to privacy from "penumbra, formed by emanations" from the Bill of Rights).

Here, the right to citizen self-government is not only presupposed by the Constitution (by flowing, as the Supreme Court recognized, from the basic theory of representative democracy), but it also follows from the ultimate sovereignty of the American people—that is, U.S. citizens— that is set forth, with the Declaration of Independence as a backdrop, in the text of the Constitution. In the first sentence of the Constitution, "We the People of the United States" "ordain and establish" the Constitution. U.S. Const., Preamble. Later, that Constitution is proclaimed to be "the supreme Law of the Land." U.S. Const. Art, VI, cl. 2. In the Constitution, then, the people ordained and established the supreme law of the land. Only the sovereign of an independent United States had the authority to do such a thing. Thus, the Constitution proclaims, with no need of a more explicit statement, the sovereignty of the people over this nation. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 454 (1793) ("To the Constitution of the United States the term SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who ordained and established that Constitution. They might have announced themselves

'SOVEREIGN' people of the United States: But serenely conscious of the fact, they avoided the ostentatious declaration.") (alterations in original) (superseded, on other grounds, by statute). *See also Brackeen v. Haaland*, 994 F.3d 249, 274 n.2 (5th Cir. 2021) ("The Constitution rooted its legitimacy in the consent of those whom it would come to govern, declaring that the system it outlined was 'ordained and established' by 'We the people,' U.S. Const. Preamble."), *rev'd on unrelated grounds by Haaland v. Brackeen*, 599 U.S. 255 (2023); *United States Term Limits v. Thornton*, 514 U.S. 779, 849 (1995) (Thomas, J., dissenting) (discussing "the notion of popular sovereignty that undergirds the Constitution."); *Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells*, 204 N.J. 79, 149, 7 A.3d 720, 763 (N.J. 2010) (dissenting opinion) (discussing the "fundamental notions of popular sovereignty, that is, that all power resides with the people and that it is only by their consent that the people may be governed. That doctrine finds its most familiar expression in the Declaration of Independence"); *id.* at 150, 763 ("That the doctrine of popular sovereignty is infused in our deepest historical traditions cannot be ignored."). *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 404-05 (1819) ("The government of the Union   . . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."); *Reynolds v. Sims*, 377 U.S. 533, 565 (1964) ("But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies."); *Alden v. Maine*, 527 U.S. 706 (1999) ("By splitting the atom of sovereignty, the founders established two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain and are governed by it.").

The Supreme Court merely assumed the obvious when it equated the people with United States citizens. *E.g., Foley*, 435 U.S. at 296 (recognizing the "right[] of *the people* to be governed by their *citizen peers*.") (emphases added). Indeed, there is no basis for saying that the "People" referred to in the Preamble include noncitizens. If noncitizens formed part of the sovereign people, it could hardly be the case that they have no fundamental right to vote, and can freely be excluded from the franchise and any other role in governing this country. Yet, of course, only citizens have a fundamental right to vote, and noncitizens are and have been almost universally excluded from voting and governing. This of course is no invidious exclusion, but an obvious consequence of the basic theory of a self-governing democracy.

Both of these propositions—that the people are sovereign, and coterminous with U.S. citizens—was emphatically the view of the founding generation. As set forth in a recent case in the Sixth Circuit:

> In general, the founders viewed "the people" as the citizens responsible for legitimating a democratic government. As James Madison explained, since "the people were in fact, the fountain of all power," their participation legitimated both the Constitution they ratified and the laws of the Congress they elected. 2 *The Records of the Federal Convention of 1787*, at 476 (M. Farrand ed., 1911) [hereinafter *Farrand's Records*]; James Madison, *Notes on a Speech to Congress* (1787) ("[I]n Elective Govt., all power in people."). It was therefore imperative, as John Adams recognized, that any democratic assembly must be "an exact Portrait, in Miniature, of the People at large" to ensure it represents "equal Interests among the People." 3 John Adams, *The Adams Papers* 80 (Robert J. Taylor ed., 1979); *see also* 5 Alexander Hamilton, *The Papers of Alexander Hamilton* 36 (Harold C. Syrett ed., 1962). For "the people," explained Thomas Jefferson, "will not acknowledge as laws any acts not considered and assented to by the major part of their delegates." Thomas Jefferson, *Notes on the State of Virginia* 131 (Boston, Lilly & Wait 1832). The founders consistently viewed participation in democratic governance as limited to American citizens, whom they referred to collectively as "the people."
>
> To limit "the people" who engaged in self-government, the founders sharply distinguished between American citizens and "aliens," who were subjects of foreign sovereigns. The clearest articulation of this view appeared in George Washington's Farewell Address, jointly authored by Washington, James Madison,

and Alexander Hamilton. The Address started from the premise that "[t]he basis of our political systems is the right of the people to make and to alter their constitutions of government." George Washington, *Farewell Address* 11 (U.S. Senate Hist. Off. 2017) (1796). "[U]ntil changed by an explicit and authentic act of the whole people," the Address continued, that Constitution was "sacredly obligatory upon all." *Id.* But constitutional government—a "blessing" of "a free people"—faced external threat from "the insidious wiles of foreign influence." *Id.* at 4, 20. The "great rule of conduct" for the young republic was "hav[ing] with [foreign nations] as little *political* connection as possible," precisely because their "influence [wa]s one of the most baneful foes of republican government." *Id.* at 20-21. Only "[i]f we remain one people" could we hope to "defy material injury from external [i.e., foreign] annoyance." *Id.* at 21-22. As the Address underscored, the founders believed democratic governance necessitated a strict division between citizens and aliens. Far from entitling aliens to constitutional rights, foreign "political connection[s]" posed a grave threat to the security and stability of "the people."

Thomas Jefferson shared his predecessor's views. Like Washington, Jefferson worried that "civil government" based on the "freest principles" could not persist in a state that permitted foreigners to arrive and immediately gain "all the rights of citizenship." Jefferson, *supra*, at 91. He therefore insisted on a strict distinction between citizens and aliens: "A foreigner" did not "acquir[e] every right of a native citizen" until he was naturalized, the culmination of a formal process that required both residency and an oath of allegiance. *Id.* at 90-91, 140; *see also id.* at 143. Before then, Jefferson stressed that aliens were barred from conveying property, bringing suits for money damages in courts, and engaging in the political process. *Id.* at 162-63. Consequently, as he observed, one of the primary political priorities of certain state governments, including Virginia's, was "defin[ing] with precision the rules whereby aliens should become citizens." *Id.* at 143. To preserve democratic government, Jefferson advocated for a rigid division between "citizens," who had civic and political rights, and "aliens," who did not.

The Federalist Papers employed similar vocabulary to link "the people" to consent-based government. As the dedication page announces, the Federalist Papers were written "To the People of the state of New-York." The Federalist No. 1, at 1 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The intended audience, then, was "the People" who would ultimately vote for or against the Constitution. This usage didn't stop at the front matter. Madison, for example, wrote in Federalist No. 46 that "[t]he federal and State governments are in fact but different agents and trustees of the people." The Federalist No. 46, at 294 (James Madison). And in Federalist No. 57, he emphasized "the right and the capacity of the people to choose their own rulers." The Federalist No. 57, at 353 (James Madison). Not to be outdone, Hamilton echoed Madison's word choice in Federalist No. 22, arguing that "[t]he fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE . . . that pure, original fountain of all legitimate authority." The Federalist No. 22, at 152 (Alexander Hamilton) (emphasis in original). So Madison and Hamilton, like their contemporaries, believed "the

people" were the citizens who consented to their government, not foreigners without a say in the process.

. . .

As the Massachusetts high court explained, "the people, in making the constitution, intended that the supreme power of legislation should not be delegated, but by citizens." *In re Opinion of Justs.*, 7 Mass. 523, 525 (1811). Absent a clear statement from "the people," political rights are automatically "restrained to such inhabitants and residents as are *citizens*." *Id.*

*United States v. Escobar-Temal*, No. 24-5668, 161 F.4th 969, 2025 WL 3632831, 2025 U.S. App. LEXIS 32707 at *47-58 (6th Cir. Dec. 15, 2025) (Thapar, J., concurring).

Indeed, the right to citizen self-government does not merely follow from popular sovereignty. It is in fact nothing more than a restatement and equivalent of popular sovereignty. If the American people do not have the right to govern themselves, they are not sovereign over this country; if they do have the right to govern themselves, they are so sovereign. Presumably, not even the District would deny the sovereignty of the American people over this country; as just shown, the sovereignty of the American people has been universally and continuously recognized as a bedrock principle of American government and constitutionalism from 1776 to the present day. Historically and today, no principle of governance could be more universally acknowledged as an essential part of our constitutional structure. The District then cannot be right when it claims that the right to citizen self-government, which is simply equivalent to this sovereignty, does not exist. Def's Memo at 33.

If the right to citizen self-government exists, it is clearly infringed by the NCVL. If enough noncitizens moved to DC to form, under the NCVL, a majority of the voting population, the ability of citizens in DC to govern themselves in local matters would be, at the very least, severely compromised. And there is no magical point between such a majority and any lesser number of noncitizen voters at which the impairment of the ability of these citizens to govern

themselves would cease to exist. It follows that any number of noncitizen DC voters (the District admits that there has been at least one, Def's Memo at 3[2]) impairs the power of these citizens to govern themselves to some degree, and therefore to the same degree infringes their right to citizen self-government. For this reason, the NCVL is invalid in all of its applications.

### III.    Plaintiffs' Due Process Claim is Meritorious

Regarding Plaintiffs' due process claim, the District would have this Court insist on the narrowest possible description of the asserted fundamental right—here, the right to vote in elections in which only citizens vote. Def's Memo at 6-10. That right, it argues, citing examples, is not deeply rooted in history and practice. *Id.* at 10-19. But there is nothing against the careful-description requirement set forth in *Dep't of State v. Munoz*, 602 U.S. 899, 910-11 (2024), and other cases in Plaintiffs' assertion that there is a fundamental right to citizen self-government protected by the Due Process Clause. This right has direct reference to the facts of this case, *Hedgepeth ex rel. Hedgepeth v. WMATA*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.), since the NCVL directly infringes it. And, since it is equivalent to popular sovereignty itself, it is no mere generality, *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 701 n.5 (D.C. Cir. 2007) (en banc), unless popular sovereignty is a mere (and false) generality, akin to "the right to die," *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997), and "the right to freedom from restraint," *Hedgepeth*, 386 F.3d at 1155-56. To the contrary, the District's examples notwithstanding, popular sovereignty is deeply rooted in our nation's history and tradition to a superlative, probably unique, degree.

---

[2]  According to a spokeswoman of the District, 523 noncitizens were registered to vote in DC as of May 29, 2024. Danielle Wallace, *More than 500 noncitizens registered to vote in DC Council elections Tuesday despite House reckoning,* Fox News (June 4, 2024), https://www.foxnews.com/politics/more-than-500-noncitizens-registered-vote-dc-council-elections-tuesday-despite-house-reckoning.

The District makes much of the history it has unearthed of noncitizen voting in the United States, claiming that it cannot be unconstitutional because it happened in the founding generation. Def's Memo at 11. Yet in a footnote it explains that other relics of the past, such as excluding nonwhites and women from voting, are of course unconstitutional, even though they were near-universal. *Id.* at 11 n.4. Women, for example, were denied the right to vote until 1920, even though the exclusion rather glaringly violated the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court in *Minor v. Happersett*, 88 U.S. 162 (1874), possibly fearing to attempt a revolution from its courtroom, expressly declined to reach any basis for relief not argued by the petitioner's attorneys, and so confined its decision to the Privileges and Immunities Clause of the Fourteenth Amendment, leaving the Equal Protection Clause safely to the side. *Id.* at 165, 170. Here, too, the District's evidence might be adequate to defend against a Privileges and Immunities claim against noncitizen voting, but it has no tendency to show that Plaintiffs' equal protection claims, or their claim from the sovereignty of the people and the basic theory of democratic self-government, are faulty, any more than the historic denial of women's suffrage showed that the petitioner in *Minor v. Happersett* would have made an invalid equal protection claim, or any more than decades of school segregation throughout large parts of the country showed that *Brown v. Board of Education*, 347 U.S. 483 (1954), was decided wrongly.

Even considered in themselves, these examples are not as damaging to the right of citizen self-government or the right to vote in elections in which only citizens vote as the District would have it. First, either they are from a time before any clear standard for determining who was an American citizen existed or, because they were expansions of the franchise to aliens who were already going through the process of naturalization, they preserved the spirit of citizen self-government if not its letter. *See Minor*, 88 U.S. at 177 (stating that several states did not require

citizenship itself for voting, but allowed that "persons of foreign birth, who have declared their intention to become citizens of the United States, may under certain circumstances vote."). Furthermore, what the history of voter qualifications drawn out by the District shows is, over time, a gradually greater adherence to, and convergence on, the theory of democratic liberty, which includes equal protection. That convergence gradually expanded the franchise from favored groups to all citizens of age, and also eliminated any noncitizen voting, so that, by the 1920s, all citizens could vote, and no noncitizens could vote. Democratic liberty was maximized in both directions.

The District's preferred history is far from enough to dislodge popular sovereignty, and its equivalent, the right to citizen self-government, from its central, fundamental position in our nation's history and tradition. Needless to say, the District can assert no compelling or even cognizable governmental interest in infringing or undermining this universally acknowledged basis of government itself—the sovereignty of the people.

## CONCLUSION

For the foregoing reasons, Defendant's renewed motion to dismiss should be denied.

Date: January 20, 2026                    Respectfully submitted,

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC
D.C. Bar No. 492551
MATT A. CRAPO
D.C. Bar No. 473355
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 328-7004
chajec@fairus.org
mcrapo@fairus.org

*Counsel for Plaintiffs*