## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RALPH CHITTAMS**, *et al.*, | |
| **Plaintiffs**, | |
| v. | **No. 1:23-cv-01261-ABJ** |
| **DISTRICT OF COLUMBIA BOARD OF ELECTIONS,** | |
| **Defendant.** | |

## <u>REPLY BRIEF IN SUPPORT OF</u>
## <u>DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.    The Substantive Due Process Claim Fails. ........................................... 2

        A.    The Asserted Fundamental Right Is an Exclusive Right of Citizens to Vote ................................................................................................ 2

        B.    An Exclusive Right of Citizens to Vote Is Not Deeply Rooted in This Nation's History and Tradition. ................................................. 4

            1.    Plaintiffs Fail to Put Forward a Historical Showing to Support Their Supposed Right. ................................................. 4

            2.    Plaintiffs' Reliance on Case Law and Generalities Fails to Carry Their Burden. ........................................................... 6

                a.    The *Foley* Line of Cases Does Not Support Plaintiffs' Claim. ...................................................... 7

                b.    A Right to Exclusive Citizen Voting in Local Elections Does Not Follow From Plaintiffs' Mistaken Generalities. ........................................... 9

        C.    The Voting Act Has a Rational Basis. ...................................... 12

    II.    The Equal Protection Claims Fail. ...................................................... 14

        A.    The Voting Act Is Facially Neutral. ......................................... 15

        B.    Plaintiffs Have Not Plausibly Alleged Facts Showing That the Voting Act Has a Discriminatory Purpose. ............................... 21

        C.    U.S. Citizens and U.S.-Born Individuals Are Not Suspect Classes. ......... 23

    III.    The "Right to Citizen Self-Government" Claim Fails. .......................... 24

CONCLUSION .............................................................................................................. 25

## INTRODUCTION

Plaintiffs do not carry any of their many burdens. *See* Pls.' Opp'n [36]. For their substantive due process and "right to citizen self-government" claims, they needed to come forward with historical evidence. And for their equal protection claims, they needed to point to statutory text showing discriminatory treatment or plausible factual allegations showing discriminatory purpose. But instead of history, text, or facts, Plaintiffs' Opposition relies on inapposite cases stretched beyond their context, Plaintiffs' political views about "sovereignty," and made-up equal-protection rules. None of that is sufficient to state a claim.

These failures are all the more striking considering how radical Plaintiffs' claims are. Recognizing Plaintiffs' new rights and precepts could work a sea change in the law, render parts of the Constitution and statutes from the Founding to the modern day suddenly unconstitutional, and unleash a wave of new claims. So one would expect a particularly strong showing from a party asking this Court to go where none has gone before. Yet, Plaintiffs only offer ahistorical policy theories and novel extensions of settled jurisprudence.

Still, Plaintiffs are not without recourse if their Amended Complaint is dismissed. If they oppose the Local Resident Voting Rights Amendment Act of 2022 (the Voting Act), they can pursue a legislative repeal (with the D.C. Council or Congress), an initiative, or a referendum. Thus far, Plaintiffs have only tried a lawsuit. The Court, however, "must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (citation modified). And so, the Court should return Plaintiffs' policy dispute to the political arena and dismiss the Amended Complaint.

**ARGUMENT**

I.     **The Substantive Due Process Claim Fails.**

Plaintiffs' arguments are insufficient to create a new, unenumerated, fundamental right—particularly under the demanding standard for facial challenges, which they do not dispute applies.  Their efforts to broadly frame the right at issue do not comport with precedent or their own prior positions.  And Plaintiffs fail to marshal *any* historical evidence recognizing a fundamental right of citizens to exclude non-citizens from voting in local elections.

A.     **The Asserted Fundamental Right Is an Exclusive Right of Citizens to Vote.**

Plaintiffs resist the well settled, critical requirement that substantive due process analysis begin with "a careful description of the asserted fundamental liberty interest."  *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (citation modified).  They argue that the District errs in framing the right here as "the right to vote in elections in which only citizens vote," and instead the right is the "right to citizen self-government," which is "is equivalent to popular sovereignty."  Pls.' Opp'n at 21.  From there, Plaintiffs argue that "popular sovereignty" is "deeply rooted in our nation's history and tradition."  *Id.* at 21.  Plaintiffs' efforts to reframe the right at issue are unavailing for two reasons.

First, Plaintiffs already agreed with the District's description of the right.  At the start of this case, the District likewise described the right as the right of citizens to exclusively vote in local elections, and Plaintiffs responded that their Complaint "does allege the exact 'carefully described' right defendant suggests."  Pls.' Opp'n to Def.'s Mot. to Dismiss [12] at 18.  On appeal, Plaintiffs also took the position that "Plaintiffs' substantive due process claim" asserts the "right" "to vote in an election in which only citizens vote."  Principal Br. of Pls.-Appellants at 21, *Hall v. D.C. Bd. of Elections*, Nos. 24-7050, 24-7065 (D.C. Cir. Aug. 22, 2024).  And even now, Plaintiffs argue that the Voting Act "takes away" citizens' "exclusive right to vote."  Pls.'

2

Opp'n at 4.  Given Plaintiffs' positions, the Court should treat as conceded that the right at issue is the right to vote in a local election in which only citizens vote.  *See Munoz*, 602 U.S. at 910–11 (adhering to plaintiff's "concession" regarding the articulation of the asserted liberty interest); *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 11035 (D.C. Cir. 2011) (holding a plaintiff to concessions he made in response to a motion to dismiss and his prior framing of his claims).

Second, a "right to citizen self-government" or a right to "popular sovereignty" is a "broad generalization."  *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 701 n.5 (D.C. Cir. 2007) (en banc).  It is not a right carefully described with specific reference to the "plainly pertinent fact[s]" of this case because it could apply to any number of factual scenarios.  *Hedgepeth ex rel. Hedgepeth v. WMATA*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.).  For example, a supposed "right to citizen self-government" would seem implicated anytime a non-citizen participates in government, from speaking at a town hall to meeting with a legislator.  Because such a right covers situations far and away from this case, it is too general.

Moreover, "popular sovereignty" is an amorphous doctrine—not an individual right enforceable through the rubric of substantive due process.  *See Popular Sovereignty*, Merriam-Webster Dictionary, https://tinyurl.com/2knrrhak ("a doctrine in political theory that government is created by and subject to the will of the people"); Pls.' Opp'n at 2 (popular sovereignty is a "principle of American government").  But substantive due process protects negative rights, that is, "limitation[s] on the State's power to act," rather than affirmative obligations on the government.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Plaintiffs point to no precedent—and the District is aware of none—holding that substantive due process is a tool for weaponizing political theories to compel the government to restructure itself.

*Cf. Baker v. Carr*, 369 U.S. 186, 218 (1962) (finding nonjusticiable claims arising under the Constitution's clause guaranteeing every state a republican government).

    **B.**    **An Exclusive Right of Citizens to Vote Is Not Deeply Rooted in This Nation's History and Tradition.**

        **1.**    **Plaintiffs Fail to Put Forward a Historical Showing to Support Their Supposed Right.**

Plaintiffs put forward no evidence to show that the right of citizens to vote exclusively in local elections is "objectively, deeply rooted in this Nation's history and tradition." *Munoz*, 602 U.S. at 910 (citation modified). Rather than carry their heavy historical burden, Plaintiffs offer a scattershot of arguments attempting to negate the District's showing. Pls.' Opp'n at 22–23. As a general matter, Plaintiffs have things backwards. It is Plaintiffs' burden to provide evidence that a right to exclusive citizen voting is deeply rooted in the Nation's history. It is not the District's burden to produce a history of non-citizen enfranchisement. Accordingly, Plaintiffs' arguments lack merit and fail to carry their burden.

First, Plaintiffs liken non-citizen voting to the most invidious "relics of the past, such as excluding nonwhites and women from voting," *id.* at 22, and theorize that history reveals "a gradually greater adherence to" their "theory of democratic liberty," which "gradually eliminated any noncitizen voting," *id.* at 23. Even accepting that revisionist account, it simply means non-citizen voting has historically been a policy choice on which preferences have changed over time. Yet, Plaintiffs cite nothing to support the idea that fundamental rights can arise "gradually" "over time" in response to political developments. *Id.* To the contrary, a substantive due process right must be "deeply rooted." *Munoz*, 602 U.S. at 910 (citation modified). In addition, Plaintiffs' comparison between disenfranchisement based on race or gender and non-citizen enfranchisement is inapt to say the least. Discriminatory practices *excluding* people from

4

the franchise based on racism or misogyny cannot, as a matter of law or common sense, be equated with a practice that *includes* people in the franchise regardless of citizenship.

Second, Plaintiffs seem to suggest that the District's reliance on *Minor v. Happersett*, 88 U.S. 162 (1874), is misplaced because *Minor* only assessed a claim under the Privileges and Immunities Clause. Pls.' Opp'n at 22. The Supreme Court in *Minor* observed as historical fact that states have widely permitted non-citizens to vote, 88 U.S. at 177, so *Minor* is relevant for that reason, and the Court's observation did not depend on the Privileges and Immunities Clause. Regardless, the District marshalled much more historical evidence than just *Minor*. Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss Pls.' Am. Compl. (Def.'s Mot.) [34] at 10–19. Thus, Plaintiffs' efforts to distinguish one case fail to negate the District's showing, let alone carry their burden to come forward with historical evidence affirmatively recognizing their right.

Third, Plaintiffs argue that non-citizen voting occurred "before any clear standard for determining who was an American citizen existed." Pls.' Opp'n at 22. But Plaintiffs do not identify when a "clear standard" crystallized, nor do they cite any support for this argument. To the contrary, since the Founding, there has indeed been a concept of national citizenship. *E.g.*, *Minor*, 88 U.S. at 165–66. Plaintiffs cannot refute that the Founders used citizenship as a qualification from the Constitution's inception, Def.'s Mot. at 14–15, and some of the early states did impose a citizenship qualification, Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the United States* 19 (2006), https://tinyurl.com/5aepa5bd; Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1404 (1993). Thus, there was enough of a "standard" of American citizenship that states could have imposed a citizenship qualification for voting since

the Nation's earliest days. The fact that most did not is further proof that there exists no right of citizens to vote exclusively in local elections.

Fourth, Plaintiffs argue that some examples of non-citizen enfranchisement only applied "to aliens who were already going through the process of naturalization." Pls.' Opp'n at 22. For support, Plaintiffs just cite *Minor*'s discussion of a few states while ignoring all the other examples of non-citizen enfranchisement that did not have such a qualification—including states discussed in *Minor* itself. *See Minor*, 88 U.S. at 177. Moreover, as Plaintiffs do not dispute, they must show that enfranchisement of *any* non-citizen is unconstitutional because they bring a facial challenge. *See* Def.'s Mot. at 6. Plaintiffs seem to concede that Supreme Court precedent and history contemplate that at least non-citizens pursuing naturalization could be enfranchised. Such a concession is enough to defeat their claim. *See Comm. on Ways & Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) ("If the statute is constitutional in at least one scenario, the facial challenge fails." (citation modified)); *Newman v. Moore*, 151 F.4th 472, 484 (D.C. Cir. 2025) (affirming judgment on the pleadings when a plaintiff's "own concessions demonstrate[d] that she cannot meet" the standard for facial challenges).

## 2.    Plaintiffs' Reliance on Case Law and Generalities Fails to Carry Their Burden.

Without any history on their side, Plaintiffs are left to argue that the right of citizens to vote exclusively in local elections (1) was recognized in *Foley v. Connelie*, 435 U.S. 291 (1978); *Ambach v. Norwick*, 441 U.S. 68 (1979); and *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982), Pls.' Opp'n at 13–16, and (2) "follows from the ultimate sovereignty of . . . U.S. citizens," *id.* at 16– 21. Neither theory suffices to carry Plaintiffs' burden.

a.    __The *Foley* Line of Cases Does Not Support Plaintiffs' Claim.__

Plaintiffs again argue that a handful of inapposite cases from the late 20th century (*Foley*,

*Cabell*, and *Ambach*) "held" that "there is a right to citizen self-government."  Pls.' Opp'n at 13.

Even assuming that these cases in fact recognized the "principles" that Plaintiffs say they did, *id.*

at 15, the question here is whether an alleged right is "deeply rooted in our history and tradition,"

and that question requires "careful analysis of the history of the right at issue," *Dobbs v. Jackson*

*Women's Health Org.*, 597 U.S. 215, 237–38 (2022) (citation modified).  And so, language and

reasoning in a handful of modern judicial opinions is no substitute for history of a right.  *See id.*

In fact, Plaintiffs make the same mistake that the Supreme Court corrected in *Dobbs*, where the

Court held that late 20th-century cases erred in recognizing a fundamental right based on

supposed principles inherent in the Constitution rather than performing a careful historical

analysis.  *Id.* at 235–36, 239–41.

That aside, Plaintiffs' few cases did not hold that there is a judicially enforceable,

fundamental right of citizens to exclude non-citizens from local elections.  Rather, these cases'

narrow holdings were that states *could*, under rational-basis review and without offending the

Equal Protection Clause, require that state police officers, public schoolteachers, and probation

officers be citizens.  In none of these cases did the Supreme Court address the issue here of

whether substantive due process or some other provision of the Constitution grants citizens a

judicially enforceable, fundamental right to exclude non-citizens from local elections.  Nor did

the Court even address all "permissible citizenship requirements" that states may impose

consistent with the Equal Protection Clause.  *Cabell*, 454 U.S. at 444.  Accordingly, "the actual

holdings of the cases" could "hardly establish the capacious right [Plaintiffs] now assert[ ]."

*Kerry v. Din*, 576 U.S. 86, 94 (2015) (plurality).  The Supreme Court, after all, would have

spoken far more clearly had it intended to repudiate the long history of non-citizen

enfranchisement, not to mention its own prior pronouncements on non-citizen voting. *See Minor*, 88 U.S. at 177; *Pope v. Williams*, 193 U.S. 621, 632 (1904); *Herron v. Fannie Mae*, 861 F.3d 160, 168 (D.C. Cir. 2017) ("[T]he [Supreme] Court does not overturn or limit its prior holdings through silence or implication.").

Plaintiffs nonetheless misconstrue language from these opinions as a "recognition of this right" to citizen self-government that "was a necessary part of [the Court's] reasoning." Pls.' Opp'n at 14. But "general language" in Supreme Court opinions "should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004)); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023). The Supreme Court made the statements cited by Plaintiffs when explaining that because non-citizens have no constitutional right to participate in self-government, states have "wider latitude" to enact laws "limiting the participation of noncitizens" in "the functions of government." *Ambach*, 441 U.S. at 75; *see Cabell*, 454 U.S. at 438–39; *Foley*, 435 U.S. at 295. But the Court did not hold that states *must* exclude non-citizens from government. Rather, the Court was clear that it only decided that state *may* exclude non-citizens from certain government functions if the state has a rational basis. *See Foley*, 435 U.S. at 296 ("a State *may* deny aliens the right to vote, or to run for elective office" (emphasis added)); *id.* at 300 ("A State *may* . . . confine the performance of this important public responsibility to citizens of the United States" (emphasis added)); *Ambach*, 441 U.S. at 74 ("a citizenship requirement *could be* imposed" (emphasis added)); *Cabell*, 454 U.S. at 445 (probation officers "*may* be limited to citizens" (emphasis added)). The Court reasoned that citizenship gives an individual the right to participate in the government, and

so states may limit participation in government to those with the right. *See Ambach*, 441 U.S. at 75. That reasoning does not answer the questions of whether states and localities *must* limit participation in state or local government to citizens and whether citizens have a right to enforce that exclusion in court.

Other aspects of the opinions indicate that the answer to both those questions is "no." For one, the Supreme Court explicitly acknowledged that not all states "confine the employment of police officers to citizens," *Foley*, 435 U.S. at 299, and New York allowed non-citizen teachers to teach in certain instances, *Ambach*, 441 U.S. at 81 n.14. If these cases recognized a right to exclusive citizen self-government, then the Court would have had to hold that allowing non-citizens to serve as police officers or teachers was unconstitutional. For another, contrary to Plaintiffs' misconception, *see* Pls.' Opp'n at 15, the legal rule applied in these cases was that state laws excluding citizens from governance receive "limited judicial review," *Cabell*, 454 U.S. at 445. Were Plaintiffs correct that the Constitution mandates exclusion of non-citizens from government, then the Court would not have engaged in any review of the state laws at issue; they would have been per se constitutional. Nor would the Court—in the case upon which the *Foley* line was built—have *struck down* a law that barred non-citizens from various civil service positions, including policymaking positions. *Sugarman v. Dougall*, 413 U.S. 634, 646 (1973).

> **b.**    **A Right to Exclusive Citizen Voting in Local Elections Does Not Follow From Plaintiffs' Mistaken Generalities.**

Moving beyond the *Foley* cases, Plaintiffs spend several pages describing their own conception of "sovereignty" and citizenship as coterminous, Pls.' Opp'n at 16–21, and arguing that the "right to citizen self-government" "exist[s]" because it "is simply equivalent to this sovereignty," *id.* at 20. But, again, Plaintiffs are wide of the mark because "the relevant question is not whether the asserted interest is consistent with" or equivalent to general principles, "but

whether it is supported by this Nation's history and practice." *Kerry*, 576 U.S. at 95 (plurality) (citation modified).  History and practice must reflect recognition of a *right*—not of vague principles of sovereignty.  *See Dobbs*, 597 U.S. at 237–38 (explaining the type of historical evidence the Supreme Court has found necessary to recognize a fundamental right); *Kerry*, 576 U.S. at 94 (plurality) (rejecting plaintiff's "[a]ttempt[ ] to abstract from [ ] cases some liberty interest").  None of Plaintiffs' cases—several of which are not even binding—speak to whether citizens have a fundamental right to exclude non-citizens from voting when popularly elected legislatures have expanded the franchise in local elections.

In any event, Plaintiffs are mistaken that the Constitution and Founders adhered to the notion that popular sovereignty means only citizens can vote and govern.  Plaintiffs do not address authority explaining that "popular sovereignty" in the United States has historically been "flexible."  Def.'s Mot. at 14 (citation modified).  Nor do they attempt to reconcile their views on sovereignty with the long history of non-citizen enfranchisement.  *Cf. Moore v. Harper*, 600 U.S. 1, 32 (2023) (declining to adopt a constitutional theory that would have rendered Founding-Era practices unconstitutional "from the start").  They simply say, without citation to anything, that "noncitizens are and have been almost universally excluded from voting and governing."  Pls.' Opp'n at 18.  But a mountain of unaddressed history refutes that claim, and Plaintiffs admit that "noncitizen voting in the United States" dates back to "the founding generation."  *Id.* at 22.

Moreover, Plaintiffs' arguments cannot be squared with a fundamental principle that the Supreme Court has long affirmed: states have broad power to determine their own governments and "define [their] political community."  *Sugarman*, 413 U.S. at 643; *see, e.g.*, *Shelby County v. Holder*, 570 U.S. 529, 543 (2013); *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).  Indeed, "[t]he right to become a candidate for state office, like the right to vote for the election of state

officers . . . is a right or privilege of state citizenship, not of national citizenship." *Snowden v. Hughes*, 321 U.S. 1, 7 (1944). Accordingly, states may extend that privilege—including to a "person of foreign birth . . . without being naturalized." *Pope*, 193 U.S. at 632. Plaintiffs' cherry-picked quotations about sovereignty are inapplicable here because Plaintiffs' cases address "sovereignty" and the "political community" in the context of the creation of the federal government. But states have their own sovereignty and political communities—which they can define for themselves (subject to certain equal-protection constraints not applicable here). *See, e.g.*, *Boyd v. Nebraska*, 143 U.S. 135, 158–60 (1892); *Oregon v. Mitchell*, 400 U.S. 112, 124–26 (1970) (op. of Black, J.). Contrary to Plaintiffs' assertion then, *see* Pls.' Opp'n at 12, there *is* a difference between federal and state political communities, and Plaintiffs' theories do not account for that difference.

Further still, Plaintiffs' views on sovereignty are incompatible with parts of the Constitution. For example, despite expressly requiring citizenship for the President, Senators, and Representatives, the Constitution imposes no such requirement for any other federal office— including justices, judges, and officers of the United States—let alone for state and local voting and officeholding. *See* Def.'s Mot. at 15; U.S. Const. art. III, § 1; *id.* art. II, § 2, cl. 2; Federalist No. 52 (1788) (Madison) (declining to "reduce[ ] the different qualifications in the different States to one uniform rule"). Consequently, the Founders permitted much of the government to be run by non-citizens. To take another example, seats in the House of Representatives are apportioned based on the general population—not just the number of citizens. *See* U.S. Const. art. I, § 2, cl. 3; U.S. Const. amend. 14, § 2; *Utah v. Evans*, 536 U.S. 452, 477 (2002) (the Founders intended that "comparative state political power in the House would reflect

11

comparative population"). As a result, many states enjoy a greater share of power in Congress due to high numbers of non-citizens.

Unsurprisingly, then, Plaintiffs cannot point to any court that has recognized a freestanding, judicially enforceable right to citizen self-government. At best, Plaintiffs cite a recent out-of-circuit solo opinion arguing that non-citizens lack Second Amendment rights. Pls.' Opp'n at 18–20 (citing *United States v. Escobar-Temal*, 161 F.4th 969, 989–90 (6th Cir. 2025) (Thapar, J., dissenting in part and concurring in the judgment)). *But see Escobar-Temal*, 161 F.4th at 976–77 (majority) (holding that "the people" in the Second Amendment is not limited to citizens and recognizing that "noncitizens could vote" at the Founding). This is not a Second Amendment case. Moreover, Judge Thapar acknowledged that historically non-citizens were allowed to vote in local elections. 161 F.4th at 994. He nonetheless argued that "the ability to vote in colonial, state, and local elections can't inform the meaning of 'the people' in the federal Constitution," *id.*, thus suggesting that non-citizen voting in state and local elections was a distinct issue from determining who holds federal rights.

### C.     The Voting Act Has a Rational Basis.

Because Plaintiffs have not shown that their asserted right is fundamental, Plaintiffs must "plausibly alleg[e] that no conceivable set of facts could support" the Voting Act. *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022). Plaintiffs, however, do not point to any factual allegations in the Amended Complaint negating all conceivable bases for the Act. Instead, Plaintiffs argue that the Voting Act lacks a rational basis because the District has no "cognizable" interest in "redefining" its "political community" to include non-citizens when, supposedly, Supreme Court and circuit precedent require that states and localities limit their political communities to citizens. Pls.' Opp'n at 11. At the outset, Plaintiffs cite no precedent for their premise that only certain "cognizable" interests suffice to pass rational-basis

12

review. In fact, Plaintiffs do not argue the correct rational-basis standard at all or engage with the D.C. Council's reasons for passing the Voting Act. *See* Def.'s Mot. at 21–23.

Nonetheless, Plaintiffs are wrong that the District has no "cognizable" interest in extending the franchise because they are wrong that states *must* limit their political communities to citizens. As explained, Supreme Court precedent does not support that proposition. Argument § I.B–C, *supra*. Nor does "this Circuit's precedent." Pls.' Opp'n at 11. Plaintiffs cite *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) (three-judge panel), *summarily aff'd*, 565 U.S. 1104 (2012), which upheld, against a First Amendment challenge, restrictions on temporarily present non-citizens' donations to candidates or parties, *id.* at 282–83. *Bluman* is not binding. *See* Vikram David Amar, 17A *Fed. Prac. & Proc. Juris.* § 4235 (3d ed. 2025) ("The decision of the three-judge court itself carries no greater weight as precedent than any other decision of a district court."); *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 560 (2015) ("[A] summary affirmance is an affirmance of the judgment only, and the rationale of the affirmance may not be gleaned solely from the opinion below." (citation modified)). Non-binding status aside, Plaintiffs' reliance on *Bluman* is unavailing for similar reasons as their reliance on the *Foley* cases. *Bluman* only held that Congress "*may*"—not must—"exclude foreign citizens from activities that are part of democratic self-government." 800 F. Supp. 2d at 283 (emphasis added). Further, *Bluman* held that the federal law was not underinclusive when it *allowed* lawful permanent residents to contribute to candidates and political parties. *Id.* at 290–91. Thus, *Bluman* contradicts Plaintiffs' position that exclusion of non-citizens from government or the political community is constitutionally mandatory.

Plaintiffs also suggest that the Voting Act lacks a rational basis because it allows "diplomats and illegal aliens" to vote. Pls.' Opp'n at 11. But "a law does not fail rational-basis

review for being over- or under-inclusive." *Fraternal Ord. of Police v. District of Columbia*, 45 F.4th 954, 958 (D.C. Cir. 2022). Moreover, Plaintiffs must show that the Act is irrational as applied to *all* non-citizens, so the supposed invalidity of the Act as applied to small categories of non-citizens does not help Plaintiffs state a claim. *See* Def.'s Mot. at 6. Regardless, it is untrue that the Act necessarily allows diplomats and undocumented individuals to vote. Only qualified District residents whose "principal or primary home" is "fixed" in the District can vote. D.C. Code § 1-1001.02(16); *see id.* § 1-1001.02(2)(C). Diplomats are present in the United States on diplomatic missions, so their home is not fixed here. In addition, individuals cannot vote in District elections if they "claim voting residence or right to vote in any . . . country." *Id.* § 1-1001.02(2)(C). Diplomats are government officials, here temporarily, so it is unlikely that they would disclaim a right to vote for the very government they serve. Undocumented individuals also may be unable to certify that they have disclaimed voting residence in another country. Indeed, despite amending their Complaint after multiple local elections have been conducted under the Voting Act, Plaintiffs cannot muster any factual allegations that undocumented individuals or diplomats voted pursuant to the Act.

## II.    <u>The Equal Protection Claims Fail.</u>

Plaintiffs' equal protection claims required them to show that the Voting Act discriminates on its face or was enacted with a discriminatory purpose. Plaintiffs do neither. And their quest to make U.S. citizens and U.S.-born persons as new suspect classes is beside the point and not justified in any event.[1]

---

[1]    Plaintiffs do not address—and thus concede—that the long history of non-citizen enfranchisement is a "great weight" against finding an equal protection violation in the Voting Act. Def.'s Mot. at 24 n.6 (citation omitted); *see Young Habliston v. FINRA Regul., Inc.*, No. 15-cv-2225, 2017 WL 396580, at *4 (D.D.C. Jan. 27, 2017) (Berman Jackson, J.) (a plaintiff concedes arguments made in a motion to dismiss by not addressing them (citation omitted)).

A.    **The Voting Act Is Facially Neutral.**

Under the Voting Act, both citizens and non-citizens can vote in District elections.  Thus, in Plaintiffs' own words, the Act "treats citizens and noncitizens 'the same.'"  Pls.' Opp'n at 5. Despite that wise concession, Plaintiffs make three arguments as to why the Voting Act discriminates against citizens on its face, but none has merit.

First, Plaintiffs argue that the Act discriminates on its face because it dilutes the votes of citizens and U.S.-born individuals.  *See id.* at 4 (the Voting Act's "grant of the benefit of voting to noncitizens burdens citizens by weakening the power of their votes").  But the District already explained why purported vote dilution caused by expansions of the electorate does not fit within any court's understanding of facial discrimination, Def.'s Mot. at 24–28, and Plaintiffs do not engage with that discussion or supporting case law.  At most, Plaintiffs argue that the District "admit[s]" that the Voting Act imposes "unequal treatment" because the District "urges" that rational-basis review applies and relies on cases uniformly applying such review to expansions of the electorate.  Pls.' Opp'n at 5.  However, a law that does not facially discriminate based on suspect bases receives rational-basis review.  *United States v. Skrmetti*, 605 U.S. 495, 510 (2025); *see also In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013).  Thus, to say that rational-basis review applies is to say that the law does not facially discriminate.

Plaintiffs cite no contrary case law holding that statutes expanding the electorate discriminate on their face.  The few cases relied upon by Plaintiffs do not support them.  To start, Plaintiffs compare this case to two non-binding, decades-old cases: *United States v. Palmer*, 356 F.2d 951 (5th Cir. 1966), and *Brown v. Bd. of Comm'rs*, 722 F. Supp. 380 (E.D. Tenn. 1989). Pls.' Opp'n at 5.  Neither case held that the law at issue discriminated on its face.  In *Brown*, the court made no finding on facial neutrality and instead applied rational-basis review to an expansion of the electorate—the standard for facially neutral laws.  722 F. Supp. at 399.  In

15

*Palmer*, the court evaluated a parish's decision to close the voter registration office where most potential applicants were Black. 356 F.2d at 952. The court found the closing decision's apparent neutrality—in that the office was closed to *everyone*—was not sufficient to overcome the parish's discriminatory motive, so the parish violated the Voting Rights Act. *Id. Palmer* merely illustrates how a facially neutral law can be discriminatory if motivated by a discriminatory purpose. But Plaintiffs here do not allege or even argue that the D.C. Council acted with a discriminatory purpose. *See* Argument § II.B, *infra*.

Next, Plaintiffs reason that because the D.C. Circuit found that their allegations of vote dilution plausibly showed standing, the Circuit necessarily found that the Voting Act was facially discriminatory. Pls' Opp'n at 6. It should go without saying, "the question of standing is a matter apart and distinct from the merits of the substantive claims put forth." *Tax Analysts & Advocs. v. Blumenthal*, 566 F.2d 130, 142 (D.C. Cir. 1977); *see Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (a court's "threshold inquiry into standing in no way depends on the merits of the petitioner's contention that particular conduct is illegal" (citation modified)). The D.C. Circuit did not apply the test for determining facial discrimination in an equal protection challenge. The Circuit simply found that the alleged *effect* of the Voting Act was to dilute Plaintiffs' votes, and that dilution was a cognizable injury solely for Article III purposes. *See Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 206 (D.C. Cir. 2025) ("[Plaintiffs] allege that the [Voting Act] *causes* a debasement or dilution of the weight of a citizen's vote from the expansion of the franchise." (emphasis added) (citation modified)). But as the District explained and Plaintiffs ignore, while vote dilution may be an alleged *effect* of the Act, it is not a discriminatory classification apparent on the Act's face. Def.'s Mot. at 25–26; *see Shaw v. Reno*, 509 U.S. 630, 649–50 (1993) (explaining that the vote-dilutive laws reviewed by the Supreme

Court "do not classify voters on the basis of race").  Contrary to Plaintiffs' assertion then, there is no tension between the straightforward conclusion that the Act is facially neutral and the D.C. Circuit's narrow decision on standing.[2]

Last, Plaintiffs suggest that a First Amendment case, *United States v. O'Brien*, 391 U.S. 367 (1968), that in turn cited a Fifteenth Amendment case, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), created an equal-protection rule that a law is facially discriminatory if its "inevitable effect is to dilute the votes of citizens."  Pls.' Opp'n at 6–7.  Neither case had to do with facial neutrality or vote dilution.  To the contrary, *Gomillion* shows how a law may be discriminatory "even when the governing legislation appears neutral on its face."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  The *Gomillion* Court found that plaintiffs adequately alleged racial discrimination when a state redistricted to remove almost all the Black voters from a district, and there was no other explanation for that choice besides race.  364 U.S. at 341–42.  In accord, *O'Brien* explained that what made the *Gomillion* redistricting unconstitutional was that its "inevitable effect" "was to deprive the petitioners of their right to vote for no reason other than that they were [Black]."  391 U.S. at 385; *accord City of Mobile v. Bolden*, 446 U.S. 55, 62–63 (1980) (plurality) ("The constitutional infirmity of the state law in [*Gomillion*] . . . was that in drawing the municipal boundaries the legislature was 'solely concerned with segregating white and colored voters by fencing Negro citizens out of town' . . . ." (quoting *Gomillion*, 364 U.S. at 341)).  *Gomillion* thus stands for the proposition that, in a rare case, a "starkly disparate impact unexplainable on grounds other than race" may

---

[2]  Notably, to find standing in *Hall*, the D.C. Circuit mainly relied on *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), while expressly noting that the vote-dilution claim there was "reject[ed] . . . on the merits."  141 F.4th at 206.

tend to show a discriminatory purpose. *United States v. Johnson*, 40 F.3d 436, 441 (D.C. Cir. 1994) (citation modified); *see Arlington Heights*, 429 U.S. at 266.

Accordingly, *Gomillion* and *O'Brien* do not create any supposed "inevitable effects" rule—they comport with ordinary equal-protection principles: A facially neutral law will not trigger heightened scrutiny unless it has an "invidious discriminatory purpose," which, in a "rare" case, may be shown if "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights*, 429 U.S. at 265–66. *Gomillion* and *O'Brien* do not address the antecedent question of whether a law is facially neutral.

Regardless, Plaintiffs' "inevitable effects" argument fails on its own terms because the Voting Act does not inevitably result in vote dilution. The Act only *allows* non-citizens to vote; it does not *require* them to vote. So-called vote dilution will only occur if non-citizens in fact vote. Yet, the Amended Complaint contains no factual allegations plausibly showing that non-citizens have voted or plan to vote—let alone that non-citizens will vote in every election, as necessary to show that the Act is invalid in all its applications. Yet, there are many elections in which it is likely that non-citizens have not voted or will not vote.

For example, Advisory Neighborhood Commissioners (ANCs) are elected from hundreds of districts with on average only 2,000 inhabitants each. D.C. Off. of Planning, *2023 ANC and SMD Boundaries*, https://tinyurl.com/2277fttk (click "2023 Single-Member Districts by 2020 Census Population"); *see Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (on a motion to dismiss, a court may take "judicial notice of facts on the public record"). Because of the small size of these districts, it is likely that at least some of them lack any non-citizens otherwise eligible to vote, and so no non-citizen will vote in elections for certain districts. Thus, "it is implausible" that the Voting Act will result in vote dilution in every

18

election to which it applies. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682

F.3d 1043, 1050 (D.C. Cir. 2012).[3]

 Second, Plaintiffs argue that the Voting Act "expressly makes a citizenship

classification" when it says, in one subparagraph, that citizenship is required for voting, but that

subparagraph does not apply in local elections. Pls.' Opp'n at 6. Simply referencing a

characteristic does not make a law facially discriminatory. *See Skrmetti*, 605 U.S. at 512 ("This

Court has never suggested that mere reference to sex is sufficient to trigger heightened

scrutiny."). Rather, a law facially discriminates when it treats two classes differently based on a

protected characteristic—with one class treated worse. *See, e.g.*, *id.* at 514–15 (law was facially

neutral when it did "not prohibit conduct for one sex that it permits for the other"); *Rothe Dev.,*

*Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 64 (D.C. Cir. 2016) (law was facially neutral when it did

"not provide for preferential treatment based on an applicant's race" (citation modified)). After

all, equal protection "provides a basis for challenging legislative classifications that treat one

group of persons as inferior or superior to others." *Jones v. Helms*, 452 U.S. 412, 423–24

(1981). In contrast, a law is facially neutral when it treats individuals equally regardless of a

protected trait, even if the law references the trait. *See Skrmetti*, 605 U.S. at 511 (law was

facially neutral when it "prohibits healthcare providers from administering puberty blockers and

hormones to *minors* for certain *medical uses*, regardless of a minor's sex"); *Navy Chaplaincy*,

---

[3] In a footnote, Plaintiffs' Opposition cites a Fox News article to assert that 532 non-citizens were registered to vote in 2024. Pls.' Opp'n at 21 n.2. This is not alleged in the Amended Complaint, and Plaintiffs make no argument why the Court can consider a Fox News article at this stage. In any event, *registering* is not *voting*.

 In a similar vein, Plaintiffs cannot state a facial challenge with their argument that the Act is "invalid in all its applications" because even a single a non-citizen vote violates the constitutional rights of citizens. *Id.* at 21. The Act does not require non-citizens to vote, and Plaintiffs have not plausibly alleged that non-citizens will vote in every local election.

738 F.3d at 428 (policy was facially neutral when it provided that "Chaplain Corps board members shall be nominated without regard to religious affiliation" and thus "explicitly requires denominational neutrality").

When it comes to local elections, District law is citizenship neutral. Any qualified resident may vote in local elections, "regardless of" citizenship. *Skrmetti*, 605 U.S. at 511; *cf. Vacco v. Quill*, 521 U.S. 793, 800 (1997) (statutes permitting patients to refuse medical treatment were neutral because "*[e]veryone, regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment*"). This is equality—not discrimination.

Third, Plaintiffs argue that the Voting Act merits strict scrutiny because it burdens the "fundamental" "right to citizen self-government." Pls.' Opp'n at 5–6; *see also id.* at 10. There is no such right, so this argument fails for that reason alone. In addition, the fundamental right at stake must "represent[ ] more than just the manufactured 'right' to be free from the very [law] at issue in the core equal protection challenge." *Johnson*, 40 F.3d at 439 n.1.

All said, Plaintiffs fail in their efforts to show that the Voting Act facially discriminates against citizens. Plaintiffs put up even less of an effort to show that the Act facially discriminates against U.S.-born individuals. All Plaintiffs say in support of their Count 3 is that the Voting Act's "inevitable effect" "is to expand the number of foreign-born persons who may vote" and thereby "dilut[e]" the votes of "native-born" voters. Pls.' Opp'n at 7. Again, the "inevitable effects" of a statute do not render it facially discriminatory. That "all" "non-citizens" allowed to vote allegedly "are foreign-born," *id.*, does not matter because the terms of the statute say nothing about national origin, *cf. Skrmetti*, 605 U.S. at 518 ("[A] State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination."); *Pers. Adm'r*

*of Mass. v. Feeney*, 442 U.S. 256, 276 (1979) (statute granting preference to veterans did not

discriminate against women even though veterans were almost always men).

> **B.**    **Plaintiffs Have Not Plausibly Alleged Facts Showing That the Voting Act Has a Discriminatory Purpose.**

Because the Voting Act is facially neutral, Plaintiffs must show that it is discriminatory

in both its effect and purpose, that is, that the D.C. Council intended to invidiously dilute

citizens' and U.S.-born individuals' votes.  Def.'s Mot. at 29–30.  Rather than carry that burden,

Plaintiffs argue that "the purpose of the [Act] is irrelevant."  Pls.' Opp'n at 7.  Quite the opposite,

Plaintiffs "*must* plead sufficient factual matter to show that [the Council] adopted and

implemented the [Voting Act] . . . for the purpose of discriminating" against citizens or U.S.-

born individuals.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (emphasis added) (citation

modified).  Thus, Plaintiffs' equal protection claims fail because they "failed to allege" or even

argue "an essential element—purposeful discrimination."  *Frederick Douglass Found., Inc. v.*

*District of Columbia*, 82 F.4th 1122, 1147 (D.C. Cir. 2023).

Nonetheless, Plaintiffs misrely on *Gomillion* and *O'Brien* to argue that they need not

plausibly allege a discriminatory purpose because the Act's "inevitable effect is to dilute"

citizens' and U.S.-born individuals' votes.  Pls.' Opp'n at 7.  Again, *Gomillion* and *O'Brien* are

not even equal-protection or vote-dilution cases.  Moreover, they did not obviate the need to

show purposeful discrimination—the opposite is true:  *Gomillion* "confirm[s] the principle that

racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment

violation."  *Bolden*, 446 U.S. at 62 (plurality); *see id.* at 63 n.10 ("The Court has repeatedly

cited *Gomillion v. Lightfoot*, for the principle that an invidious *purpose* must be adduced to

support a claim of unconstitutionality."); *Gomillion*, 364 U.S. at 347 (explaining that the

plaintiffs stated a claim precisely because redistricting was "used as an instrument for

circumventing a federally protected right" (citation modified)).  Thus, these cases provide no

escape route for Plaintiffs from their burden to plausibly allege discriminatory intent.

Despite asserting that intent is "irrelevant," Pls.' Opp'n at 7, Plaintiffs later argue that the

Voting Act "dilutes the votes of the American-born intentionally, because its purpose, as the

District admits, was to benefit 'immigrants,'" *id.* at 10.  The District has not admitted that the

Act's purpose was to benefit immigrants.  Rather, the District has relayed the Council's

determination that the Act was intended to benefit *all* District residents by improving democracy

in local elections.  *See* Def.'s Mot. at 22–23; D.C. Council, Comm. on the Jud. & Pub. Safety,

*Report on Bill 24-0300, the "Local Resident Voting Rights Amendment Act of 2022"* at 2 (Sept.

27, 2022) https://tinyurl.com/49fxd3ha (explaining that the Voting Act was "the next step in the

expansion of the franchise" to "improve[ ] access to democracy for all District residents").

Nothing in the Amended Complaint, therefore, plausibly suggests that the Council—comprising

only U.S.-born citizens—was institutionally driven by the invidious intent to single out and

dilute the votes of U.S. citizens and U.S.-born persons.

Plaintiffs offer no authority to conclude otherwise.  *See* Pls.' Opp'n at 10.  *Students for*

*Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), sheds no

light on the validity of a facially neutral law like the Voting Act because that case involved

explicit "racial preferences," which, unlike facially neutral laws, are subject to strict scrutiny

even if "well intentioned and implemented in good faith," *id.* at 213–19; *see Bos. Parent Coal.*

*for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 61–62 (1st Cir. 2023)

(finding "no reason to conclude that *Students for Fair Admissions* changed the law governing the

constitutionality of facially neutral" policies), *cert. denied*, 145 S. Ct. 15 (2024).  Nor do

Plaintiffs pinpoint anything in *Students for Fair Admissions* that clearly abrogates the Supreme

Court's precedents barring inferences of discriminatory intent solely from the foreseeable effects of a law. *See* Def.'s Mot. at 29–30; *Fenney*, 442 U.S. at 278–80; *Herron*, 861 F.3d at 168. Lastly, Plaintiffs' analogizing to *Students for Fair Admissions* is inapt because voting is *not*, like college admissions, "a zero-sum game." Pls.' Opp'n at 10. There are not a finite number of votes like there are a finite number of seats in an entering class, so a non-citizen's vote does not take away a citizen's vote. And any supposed dilutive effects of non-citizens' votes can be diminished if Plaintiffs work to get out the citizen vote.

### C.    U.S. Citizens and U.S.-Born Individuals Are Not Suspect Classes.

Plaintiffs do not cite any precedent recognizing U.S. citizens or U.S.-born individuals as suspect classes under the Equal Protection Clause. *See* Pls.' Opp'n at 7–8. In the smattering of equal-protection cases cited by Plaintiffs, courts were not considering discrimination against U.S. citizens or U.S.-born individuals. Rather, the Supreme Court has deemed "citizenship" and "national origin" suspect characteristics only in certain cases involving discrimination against *non-citizens* or persons of *foreign* ancestry and only because of the historical discrimination and political powerlessness that such persons have faced. *See, e.g.*, *Graham v. Richardson*, 403 U.S. 365, 371–76 (1971). So, like with the *Foley* cases, Plaintiffs fail to read these opinions' reference to "citizenship" or "alienage" in the "context" of the "discrete cases and controversies" the Supreme Court was deciding. *Nat'l Pork Producers Council*, 598 U.S. at 373–74. Although Plaintiffs also cite a few non-binding cases involving citizen or U.S.-born plaintiffs, they are not equal-protection cases, but statutory, employment-discrimination cases, and so the courts did not apply the Supreme Court's demanding test for recognizing a new suspect class. *See* Pls.' Opp'n at 8; *Skrmetti*, 605 U.S. at 526–29 (Thomas, J., concurring) (explaining why Title VII precedent should not apply to equal protection); *id.* at 563–64 (Alito, J., concurring in part and concurring in the judgment) (same).

Plaintiffs do not apply that test either and thus fail to carry their burden.  Instead,

Plaintiffs simply argue that heightened scrutiny applies whenever a law classifies based on

"*characteristics*" like "national origin" or "citizenship status," regardless of whether a challenger

is a citizen or U.S.-born.  Pls.' Opp'n at 9.  As their only support, Plaintiffs rely on cases

involving race.  *Id.* at 8–9.  But race is different.  The Supreme Court has explained that any

distinction based on race is impermissible, regardless of the particular race.  *Students for Fair*

*Admissions*, 600 U.S. at 206–07.  The same is not true of citizenship or national origin because

"a host of constitutional and statutory provisions rest on the premise that a legitimate distinction

between citizens and aliens may justify attributes and benefits for one class not accorded to the

other."  *Mathews v. Diaz*, 426 U.S. 67, 78 (1976); *see, e.g.*, U.S. Const. art. I, § 1 (requiring the

President to be "a natural born Citizen").  "Heightened scrutiny is reserved for classifications

based on factors that 'are so seldom relevant to the achievement of any legitimate state interest

that laws grounded in such considerations are deemed to reflect prejudice and antipathy.'"

*Hedgepeth*, 386 F.3d at 1154 (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S.

432, 440 (1985)).  U.S. citizenship or birth are not such factors because they are "quite often

relevant to valid state concerns, as the Constitution itself attests."  *Id.*; *see Mathews*, 426 U.S. at

78 & n.12.  If, however, Plaintiffs arguments were accepted, then any laws requiring U.S.

citizenship or birth would be subject to strict scrutiny.  That cannot be right.

## III.    The "Right to Citizen Self-Government" Claim Fails.

Plaintiffs argue that their right to citizen self-government can be "implied" from the

Constitution even if it cannot be recognized under the rubric of substantive due process.  Pls.'

Opp'n at 16.  Plaintiffs do not explain what other rubric for recognizing rights this Court should

use.  At best, Plaintiffs suggest that the Ninth Amendment is a source for implying rights, *id.*, but

"the Ninth Amendment does not confer substantive rights," *Cooper Butt ex rel. Q.T.R. v. Barr*,

954 F.3d 901, 908 (6th Cir. 2020); *see also, e.g.*, *Phillips v. City of New York*, 775 F.3d 538, 544 (2d Cir. 2015). Plaintiffs also go so far to suggest that the Court can imply their right to citizen self-government from "prenumbra[s]" in the Constitution. Pls.' Opp'n at 16 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965)). However, "[s]ince *Griswold*, the [Supreme] Court, perhaps recognizing the facial absurdity of *Griswold*'s penumbral argument, has characterized the decision as one rooted in substantive due process." *Dobbs*, 597 U.S. at 332 n.* (Thomas, J., concurring). Indeed, the Supreme Court has since made clear that "[i]dentifying unenumerated rights" requires following "*Glucksberg*'s two-step inquiry," which requires a historical showing. *Munoz*, 602 U.S. at 910. Likewise, the D.C. Circuit—in another case that Plaintiffs ignore—has refused to recognize new constitutional rights, even outside the rubric of substantive due process, "[a]bsent any plausible mooring in the Constitution's text or the Nation's history and tradition." *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 73 (D.C. Cir. 2019) (per curiam). Plaintiffs decline to make a textual or historical showing, so their "right to citizen self-government" cannot be recognized by any means.

## CONCLUSION

For these reasons, the Court should dismiss the Amended Complaint for failure to state a claim.

Date: March 10, 2026

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

26